158 379
102a 1 42

## MARTIN et al., Plaintiffs in Error, v. BOWDERN, Executrix, et al.

### Division One, November 12, 1900.

1. **Will:** ATTESTATION: AT REQUEST OF TESTATOR. Although there was no formal, verbal declaration by the testator in the presence of the witnesses that it was his last will, and no formal, verbal request by him of the witnesses to attest it, yet if the testator dictated the will, and knew the witnesses had been sent for to attest it, and were waiting outside the room while it was being prepared, and that they were called in for that purpose, and in their presence he signed it, and then the draughtsman in his presence requested them to sign it, this makes a sufficient request on the part of the testator of the witnesses to attest the will.

2. ———: MENTAL CAPACITY. Where the testator knew what act he was performing, what property he possessed, the disposition he was making of it and the persons and objects of his bounty, especially if these facts appear from the face of the will itself, and he dictated its terms, his mental capacity to make the will is established.

3. ———: ———: WEAKENED BY MEDICINES. If the testator's physician prescribed spirits of ammonia, suppositories of quinine sulphate, carbonate of ammonia, syrup of ipecac, distilled water and syrup of tolu, carbonate of creosote, spiritus fermenti and syrup of tolu, to be given at short intervals, for two weeks before testator's death, and they were so given, they were *prima facie* insufficient to impair his capacity to make a will.

4. ———: ———: WHISKEY. The court will not declare, as a matter of law, that the giving of an ounce and a half of whiskey in teaspoonful doses every three hours, a short time before the will was made, to a testator sixty years old, suffering from consumption or a kindred disease, impaired his mental capacity to make a will.

5. ———: UNDUE INFLUENCE. Undue influence means such influence as amounts to over persuasion, coercion, or force, destroying the free agency and will power of the testator.

6. ———: ———: PRIEST AND CONFESSIONS. What passed between testator and a priest in confession, is a privileged communication,

and neither a court nor a jury have a right to predicate a decision of a case upon undisclosed matters occurring there. And although the testator may have given $1,000 each for the repose of the souls of himself, wife, father and mother, when the cost of masses is usually only from $25 to $50, yet what passed between the priest and testator at the time the confession was heard, when taken in connection with such bequests, do not afford such support for the charge of undue influence as to justify the submission of that issue to the jury, if the testimony of the priest, introduced by contestants, the only witness on the point, not only denies the charge of undue influence, but affirmatively shows it to be untrue. The suit must be determined by the facts proved, and not by suspicions.

7. ———: MASSES. The giving of the major portion of his estate by a testator, worth forty or fifty thousand dollars, having no wife, children or other descendants, for masses for the repose of the souls of himself, wife, mother and father, some of whom had been dead for many years, is not of itself sufficient evidence to justify or warrant a jury in finding that he was incompetent to make a will or that he was unduly influenced.

Appeal from St. Louis City Circuit Court.—*Hon. Jas. E. Withrow,* Judge.

AFFIRMED.

*M. McKeag* for plaintiffs in error.

*Julius L. Foy* and *Valle Reyburn* for defendants in error.

MARSHALL, J.—This is a suit to contest the will of James Reilly, dated October 20, 1897. The testator was a man of about sixty years of age. He was a widower, with no children and no direct descendants. His heirs at law are the plaintiffs, who are daughters of his deceased brother, and the defendant Catherine Bowdern, and the defendant William Reilly, a nephew of the half blood. The deceased was sick with consumption or some like affliction and was confined to his bed from August 8, 1897, until his death on the twenty-third of August, 1897. The will was made on the

evening of August 20, 1897.    The will bequeathed the fol-
lowing specific·legacies:    One thousand dollars each, to his
niece Mary Bowdern, his nephew James Bowdern, and his
sister Catherine Bowdern; one dollar, each, to his nieces, the
plaintiffs, daughters of his brother, Robert Reilly; one dollar
to his nephew William Reilly, the defendant-appellant, son
of his step brother, William Reilly; five hundred dollars to
Father James McCabe, as pastor for the benefit of the Sacred
Heart Catholic church, of St. Louis; four thousand dollars
to Rev. Archbishop Kain, "to be used by him for masses for
the repose of my soul, and to be said in the city of St. Louis,
Mo., as he may see fit;" one thousand dollars to Rev. Arch-
bishop Kain, for masses for the repose of the soul of testa-
tor's deceased father, William Reilly; one thousand dollars
to Rev. Archbishop Kain, for masses for the repose of the soul
of testator's deceased mother, Mary Reilly; one thousand
dollars to the Monks' church, for masses for the repose of the
soul of testator's deceased wife, Margaret Reilly, one thou-
sand dollars for the erection of a monument to his memory,
in Calvary Cemetery; fifty dollars to the Little Sisters of the
Poor; and the residue of his estate to Rev. Archbishop Kain,
for masses for the repose of his soul.    Catherine Bowdern,
his sister, and Henry Andreas, his closest friend, companion
and business agent, were appointed executrix and executor of
his will.    The estate is worth about fifty thousand dollars.
The grounds alleged for contesting the will are, first, "that
at the time the will was made the testator was not of sound
and disposing mind and memory, that he had been sick for a
long time prior thereto and had been taking medicine for
the purpose of alleviating his sufferings, that at the time of
the execution of said instrument of writing, his mind had
been so weakened and changed by disease and drugs adminis-
tered to him to alleviate his physical sufferings that he was
entirely incapable of understanding a just and proper dispo-

sition of his property, and at the time he signed said instrument of writing, he did not understand the full nature and effect of it and it does not express his intention regarding the disposition of his estate, when he was in the full use of his faculties prior to his last sickness," and, second, undue influence exercised over the testator by Rev. Patrick N. Bradley, who was assistant pastor to Father James McCabe at the Sacred Heart church, and as such subordinate to Rev. Archbishop Kain. The answer of Archbishop Kain and Father McCabe admitted the execution of the will and denied the other allegations of the petition. William Reilly, the nephew of the half blood, answered and made common cause with the plaintiffs by alleging undue influence by the testator's spiritual advisers; the executrix and executor and the other legatees made default. The will was attested by Albert Gerst, John Farrington and J. Arthur Gast. Of these Farrington was dead when the case was tried in the circuit court, and Gerst and Gast testified.

At the trial the proponents showed the execution of the will and the sanity of the testator. The testimony shown by the abstract of the record (the case is here on a certificate of the judgment) is substantially as follows:

*Albert Gerst* as a witness for the defendants, and who drafted the will, testified:

"Q. Did he ask you at that time, or did he ask Mr. Andreas in your presence, anything about the character of his estate, the extent of it or the amount? A. Not to my recollection.

"Q. What did he say at that time, if anything, respecting his relatives? A. Nothing more than when he came to the children of Robert Reilly he told me to write each of the children of Robert Reilly one dollar.

"Q. Did he mention them by name? A. No, sir.

"Q. Did he say how many they were? A. I asked him and he said he didn't know.

"Q. Didn't know? A. Not accurately he said.

"Q. Well, after the will was drawn, what then took place? A. Nothing, somebody got the witnesses, because I was not acquainted up there, and brought in Mr. Gast, Mr. Farrington, and in the presence of those two witnesses and myself, the will was signed.

"Q. Is Mr. Farrington now living? A. Mr. Farrington is dead.

"Q. Mr. Gast, however, is living? A. Yes, sir; he is living.

"Q. You saw Mr. Reilly sign it, did you? A. Yes, sir.

"Q. And you saw these two other gentlemen, who were witnesses with you, sign it? A. Yes, sir.

"Q. You signed it in their presence and in the presence of Mr. Reilly? A. Yes, sir.

"Q. Did Mr. Reilly ask you to sign as witness? A. No, sir; I always sign just as a matter of precaution. . . . .

"Q. When you went there state all that was said, what he said to you about this will? A. When I went there and took paper, he told me to sit down and he dictated as I sat there. First, he said: 'Put down the first party' and then he said something about when it came to Father McCabe, to Father McCabe for the benefit of the church, he wanted it to go to the church, that particular matter. Then he spoke about a monument. When he came to that monument clause he had rather extravagant ideas on a monument and I told him that was not in keeping with a man—he spoke about the Slevin monument in Calvary.

"Q. Go ahead? A. I think he spoke before about making the monument about $5,000 to me, that is the reason

why I made that remark. Then he spoke about the Slevin monument and I told him it was not in keeping with his lot and things of that kind, and he said: 'Well, make it $1,000, anyhow, no less than $1,000.' After making a good many bequests to the Archbishop, I told him, 'You are giving the Archbishop a good deal, ain't you?' He said: 'Well, what would you suggest?' I said: 'Do you want to give the Monks anything?' 'Well,' he said, 'put in a thousand dollars for the Monks.' "

*Henry Andreas* a witness for defendants, testified as follows:

"Q. When was this conversation that you had between Mr. Reilly and you as regards the value of the estate? A. It was on the 20th of August, 1897.

"Q. Who was present at that time? A. Mr. Albert Gerst, my partner.

"Q. Did it occur in that room at that time? A. Yes, sir.

"Q. While he was making his will? A. Yes, sir.

"Q. What else occurred? Will you please state now all that was said from the time you and Mr. Gerst went into that room until you left; were you there during the time he drew it up? A. While it was drawn and read I was there, and I stepped out then.

"Q. Please state what was said about any particular clause in that will? A. He said, first: 'I want my just debts paid, although I have not any,' and then he said: 'I give to my niece, Miss Mary Bowdern, the sum of $1,000,' and then he said: 'I give $1,000 to my nephew, Mr. Reilly Bowdern.' He mentioned particularly Reilly Bowdern and then $1,000 to his sister, Catherine Bowdern, and then I think went on with giving all the sum of one dollar to his nieces of his deceased brother, Robert Reilly, and Mr. Gerst, at that time, asked him if he remembered the name, and he

did remember the name but Mr. Gerst said it was not necessary as long as he had mentioned five of them, or all of them, that would be sufficient, and then he went on and said that he had a step-brother that had a son by the name of William Reilly, he would give him $1, and then he gave $4,000 to Archbishop Kain for the masses for the repose of his soul, and $500 to the Reverend Father James McCabe for the repose or benefit of the church, and then $1,000 to Archbishop Kain again for the repose of his father's soul, and $1,000 to Archbishop Kain for the repose of his mother's soul, and then $1— Mr. Gerst said—he was going to give $1,000 again to Archbishop Kain for his wife, and Gerst said: 'How about the Monks?' He said: 'Where are they at?' 'Down on Mermac street,' Mr. Gerst said; and he said: '$1,000 to the Monks for the repose of my wife's soul,' and then $50 to the Little Sisters of the Poor, and then: 'The balance of my property, real and personal, to go to Archbishop Kain for the repose of my soul.' Mr. Gerst said: 'The balance of your estate going to Archbishop Kain?' He said: 'Yes.' Then I said: 'There, is your sister, Mrs. Catherine Bowdern, what about her?' He said: 'It will all go to Archbishop Kain, the balance of my estate.' Mr. Gerst said: 'Who do you want named as executor of your estate?' He said: 'Mr. Andreas,' pointing to me, and I suggested also Mrs. Catherine Bowdern, his sister, that we might jointly act as executors, and he said: 'Yes, I want Mrs. Bowdern to look after my affairs as well as anybody else,' and then Mr. Gerst read these bequests over several times, and after it was all written up he read the will to him, and read it again to him, and then I was requested to call the witnesses, which I did. That was all that was said in Mr. Reilly's presence.

"Q. Have you stated all that passed between you and Mr. Gerst at that time? A. Yes, sir; and he was very par

Vol. 158 mo—25

ticular before making up the will, that he wanted everybody out of the room, except myself and Mr. Gerst, wanted the doors closed." On cross-examination the witness testified that the testator was confined to his bed from the eighth of August until his death; that he was attended by Dr. Carson, who prescribed for him and that the witness and Mrs. Bowdern, testator's sister, gave the medicine to him; that the medicine consisted principally of whiskey, which was given to him every two or three hours, in doses of a teaspoonful at a time, mixed with selzer water; that the first direct conversation he had with testator about making the will was on the day the will was made, when the testator told him to come up that evening.

*G. A. Gast,* one of the attesting witnesses, testified, as a witness for the defendants, that he signed the will as a witness at the request of Mr. Gerst, the draughtsman of the will; that it was signed by the witnesses in the testator's presence after the testator had signed it; that he, witness, knew it was Reilly's will but did not know its provisions. Absolutely the only testimony in the case as to the mental capacity or incapacity of the testator to make a will is found in the testimony of the witness as follows: "Q. At the time you signed your name there what, in your judgment, was the mental condition of Mr. Reilly? A. I believe his mental condition was first rate." This witness further testified as follows:

"Q. You say it was at the request of Mr. Gerst that you signed that paper? A. Yes, sir.

"Q. Did Mr. Gerst tell you what it was? A. Yes, sir.

"Q. He told you what it was? A. Yes, sir.

"Q. Did you have any conversation with Mr. Reilly at all about the will? A. No, sir.

"Q. He didn't say to you anything about the will at all? A. No, sir.

"Q.   Not a word?   No, sir.

"Q.   And when you went in there, Mr. Gerst told you that this was Mr. Reilly's will and asked you to sign it as a witness?   A.   Yes, sir.

"Q.   Who was present at that time?   A.   Mr. Gerst and Mr. Farrington and Mr. Reilly and I.

"Q.   Did you hear any   conversation before that day about making the will by Mr. Reilly or anybody else?   A. Yes, sir.

"Q.   When did you hear that talk?   A.   On Thursday evening.

"Q.   Before the will was made?   A.   Yes,   sir; the evening before the will was made.

"Q.   Whom did you hear converse about it then?   A. Well, I was sitting outside in the yard with Mr. Keegan, we were talking together and I heard Mrs. Keegan and Mrs. Bowdern talking to Mr. Reilly about making a will.

"Q.   You heard Mrs. Keegan and Catherine Bowdern talking to Mr. Reilly about making a will?   A.   Yes, sir.

"Q.   That was on Thursday evening?   A.   Yes, sir.

"Q.   What did he say then, what was the conversation? A.   He said he didn't want to make a will.

"Q.   And that was on Thursday evening before he made it?   A.   Yes, sir.

"Q.   He made it on Friday?   A.   Yes, sir.

"Q.   What did he say?   A.   I couldn't tell it all, I know they had a kind of argument about the will and Miss Mary Bowdern, she came up and told her mother, 'you had better stop this, if he don't want to make a will, drop it and don't have no argument about it.'   That is about all I know that was said about the will.

"Q.   And James Reilly and Catherine Bowdern were arguing about the matter?   A.   Yes, sir.

"Q.   And James Reilly seemed to be irritated about

it? A. Yes, sir; they said they thought it would be better for him to settle his affairs in case anything would happen to him."

To maintain the issues on their behalf the plaintiffs called as a witness, Rev. Patrick Bradley, who testified that he had known the testator by sight for nearly twenty years and had occasionally seen him at the Church of the Sacred Heart, of which the witness was assistant pastor, although he was a member of Saint Leo's church, but that he had never spoken to him in his life until he was called to see the testator during his last sickness; that testator was physically rather weak, and was in bed; that on the second visit he heard the confession, and the testator wanted him to take four thousand dollars and use it for masses to be said for the repose of the souls of his father, his mother, his wife and himself, but that he refused to take the money; that thereupon the testator asked him who he would suggest he should give the money to for this purpose and he suggested Archbishop Kain; that he administered to him the sacrament of extreme unction on the third or fourth visit, and visited him in all about eight times; that once after he had refused to take the four thousand dollars, the testator spoke to him about his business and told him he had made a will and began to tell him what disposition he had made of his property, but was interrupted and never finished telling him at that time; that the testator was "sick with consumption, something analogous to that;" that Mrs. Bowdern once said to him that the testator ought to make a will, but he, witness, never spoke to the deceased about it.

Fred H. Ficke, the druggist who filled the prescriptions, testified, as a witness for the plaintiff, that the first two prescriptions were filled on August 8, 1897; the first consisted of aromatic spirits of ammonia, four drams, fifteen drops to be taken in water every hour, and the second consisted of sup-

positories of sulphate of quinine, one to be used every four hours; the third, dated August 10th, consisted of carbonate of ammonia, two drams, syrup of ipecac, two drams, distilled water, two drams, and syrup of tolu, making in all six ounces, to be taken, a dessert spoonful every two hours; the fourth, dated August 14th, consisted of carbonate of creosote, one dram, spiritus fermenti, one ounce and a half, syrup of tolu, four drams, to be taken in doses of a teaspoonful every three hours; and the fifth, dated August 22d, two days after the will was executed, which therefore is not material here.

Annie Keegan, the testator's sister-in-law, testified as a witness for the plaintiffs, that the testator never suffered very much, he seemed weak, but did not complain; that on the nineteenth of August she spoke to him about making his will, but that "he didn't think he was going to die, didn't seem likely to die;" that his business was scattered and it would be a hard matter for him to make a will, but "he expected to get well and could go out and do it;" that his father and mother had been dead more than twenty-five years, and his wife thirteen years.

Upon this testimony the court gave the jury a peremptory instruction to find for the defendants, establishing the will, which the jury did, and the plaintiffs perfected this appeal.

## I.

There is no merit in the contention that the evidence does not show that the witnesses signed the will at the request of the testator. He asked Andreas on the twentieth of August to come to see him that night. Andreas and Gerst went. The testator dictated the will and the special bequests were read to him several times and when Gerst finished writing the will it was read to him again, then the witnesses were called, the testator signed the will in their

presence.  Mr. Gast, one of the witnesses, says the draughts-man Mr. Gerst, asked him to sign it, he knew it was Reilly's will but did not know its contents, and he signed it in the presence of the testator and in the presence of the other witnesses, at a little table four or five feet from the testator. There was no formal, verbal declaration by the testator in the presence of the witnesses that it was his last will, and no formal, verbal request by him to the witnesses to attest it, but the testator dictated the will, he knew the witnesses were waiting outside of the room to attest it, and that they were called in for that purpose, and in their presence he signed it, and the draughtsman requested the witnesses to attest it. This was a sufficient request to them to do so.  [Schierbaum v. Schemme, 157 Mo. 1; Grimm v. Tittman, 113 Mo. 56; 29 Am. and Eng. Ency. of Law (1 Ed.) 205, note 6.]

## II.

The testimony amply shows that the testator was of legal age, sane and fully competent to make a will.  He knew what act he was performing, what property he possessed, the disposition he was making of it and the persons and objects of his bounty, for he dictated the terms of the will himself, and the face of the will shows these facts.  This is all the law requires.  [Sehr v. Lindemann, 153 Mo. loc. cit. 288, and cases cited.]  The testimony of Gast is uncontradicted, and shows that at the time the testator made the will his mental condition was "first rate."  No witness on either side even suggests a doubt as to his mental capacity.  It is true the plaintiff's evidence shows that he had been sick in bed for about twelve days at the time the will was executed, and was afflicted with consumption or some such disease.  But this testimony also shows that Mrs. Keegan his sister-in-law spoke to him the day before this will was made about mak-

ing a will and he said he didn't think he was going to die and when he got well he would do so.    She must therefore be taken to have believed him competent to make a will.    His mental capacity must therefore be taken as fully established.

The petition charges that the testator's mental condition had been weakened and changed by the medicines he had taken to alleviate his sufferings so that he was entirely incapacitated to make a will.

The testimony wholly fails to support the charge.    It appears that on the eighth of August, he was given aromatic spirits of ammonia, to be taken in doses of fifteen drops, in water, every hour, and suppositories of quinine sulphate, to be used every four hours; that on the tenth of August a prescription of carbonate of ammonia, syrup of ipecac, distilled water and syrup of tolu, was given him to be taken in doses of a dessert spoonful every two hours, and that on August 14th he was given a prescription of carbonate of creosote, spiritus fermenti and syrup of tolu, to be taken in doses of a teaspoonful every three hours.    These medicines were prescribed by Dr. Carson, his attending physician, and, *prima facie* must be held to be insufficient to impair his capacity to make a will.    There is no testimony in the case controverting this *prima facie* showing and therefore it must be taken as conclusive that the medicines did not impair his mind.    Great stress is laid upon the fact that the prescription of August 14th contained whiskey—an ounce and a half—and that this was given to him in teaspoonful doses every three hours, but no evidence is adduced that even whiskey administered in such doses at such intervals will impair in six days a man's mental capacity to make a will, and we decline to so decide as a matter of law.

The proponents therefore showed all the law requires of them in the first instance, and the burden of proof then

shifted to the plaintiffs to show undue influence.

## III.

Undue influence means such influence "as amounts to overpersuasion, coercion, or force, destroying the free agency and will power of the testator." [Tibbe v. Kamp, 154 Mo. l. c. 579, and cases cited; Sehr v. Lindemann, 153 Mo. l. c. 289, and cases cited; Schierbaum v. Schemme, 157 Mo. l. c. 11.]

The undue influence charged in the petition is that of Rev. Patrick H. Bradley, assistant rector of the Sacred Heart church. The only testimony offered by the plaintiffs to support this charge was that of Rev. Bradley himself. So far from giving any countenance to the charge, the testimony of this witness emphatically denies the charge, and affirmatively shows that such was not the case. He never spoke to the testator until called to see him during his last sickness. The testator was not a member of the parish of which the witness was assistant pastor. On the second visit of the witness the testator wanted to give him four thousand dollars, to be used by him for masses to be said for the repose of the souls of his father, mother, wife and himself, but the witness refused to take the money. The testator then asked the witness who he would suggest the money for this purpose should be given to, and the witness replied Archbishop Kain was the richest man in the church in St. Louis and if the money was given to him he would see that it was used as the testator desired. Afterwards the testator told Rev. Bradley he had made a will, and told him its provisions, and in speaking of the provisions for his relatives said: "They have already gotten more than is coming to them from me." Archbishop Kain was in Europe when the will was made, and is not shown to have known either of the will or of the testator.

But plaintiffs argue that while this may all be true, still what passed between the testator and the witness when the latter heard the confession of the former may afford support for the charge of undue influence, and that the jury had a right to pass upon that feature of the case, especially in view of the large sums devised for masses and the fact that the cost of masses is usually only from $25 to $50.

Law suits are determined by the facts proved and not by mere suspicions drawn from matters which are not proved, and proof of which would be inadmissible. What passed between Rev. Bradley and the testator in confession, are privileged communications, and neither a court nor a jury have any right to predicate a decision of a case upon such undisclosed and incompetent matters. The plaintiffs wholly failed to introduce any semblance of testimony even tending to support the allegations of the petition that the will was the result of the undue influence of Rev. Bradley, and therefore there was no controverted question of fact in the case which it would have been proper to submit to the determination of the jury, and the court did right in directing a verdict, unless the fact that the major portion of the estate was left to be used for masses to be said for the repose of the souls of testator's father, mother, wife and himself, is in and of itself sufficient evidence to justify or warrant a jury in finding that the testator was incompetent to make a will or was unduly influenced.

## IV.

The testator was a widower. He had no living children or direct descendants. His nearest relatives were his sister, Mrs. Bowdern, and her children, who were given one thousand dollars each, and who do not contest the will, and his nieces the plaintiffs, who are the children of his deceased

brother Robert, and his nephew, the defendant, William Reilly, who is son of his step-brother William. The testimony offered by the plaintiffs showed that in speaking to Rev. Bradley of the provision he had made in his will for his relatives the testator said: "They have already gotten more than is coming to them from me." After he became so sick that he was confined to his bed he caused four or five masses to be said for the repose of the souls of his father, mother and wife.

The bulk of the estate was devised for use in having masses said for the souls of his father, mother, wife and himself. The father and mother had been dead about twenty-five years, and the wife about thirteen years, and counsel for plaintiffs argue that if their souls had already gone to Heaven they needed no masses, and if not, masses now would be unavailing, and, moreover, that if this is a trust fund, who and before what tribunal is a charge that the use has been subserved or the trust been violated to be made, heard and determined? The answer is complete. The property was the testator's. The law gives him the power to direct its disposal by will. He has done so, while, so far as the evidence in this case shows, in the full possession of his faculties and without the undue influence of any one, and without legal injury to any one who can be heard to complain. It is enough, in this case, that the disposition made of his property was satisfactory to the testator. Whether any or how much good such a disposition would do, is not a question for a court or jury. It does not lie in the province of these plaintiffs to question the propriety at any time, for the further use of the trust fund or of its misappropriation, if such be the case, and there is no suspicion even of such a thing in this record.

The plaintiff wholly failed to make out a case, and the trial court properly directed a verdict. The judgment is affirmed. All concur.