BEAN *v.* BEAN.

144    599
149   ³506

144   599
f151  ¹517

144   599
152   ³599

1. WILLS — CONTEST — TESTAMENTARY CAPACITY — INSANE DELUSIONS.

The opinion of a father that certain of his children, whom he disinherited, had wronged and cheated him, and were scheming to get possession of his property, cannot be said to be the result of insane delusions, so as to invalidate his will, where there were real controversies between them which may have given rise to his belief, irrespective of which of the parties might have been able to make the better showing of real right.

2. SAME.

The opinion of a father that a son has no regard for him, and is waiting for him to die in order to get a portion of his estate, cannot be said to have no foundation in fact and to be the result of an insane delusion, except, it may be, in cases where relations, induced by a lifetime of dutiful conduct on the one side and of continued and known affection on the other, are suddenly and without known cause interrupted and succeeded by an attitude on the part of the father utterly inconsistent with past conduct.

3. SAME—ESTOPPEL TO CONTEST—AGREEMENT AMONG HEIRS.

A testator having made two wills, the later of which left substantially all his property to one son, his heirs agreed in writ-

ing that the later will should be probated and the property distributed in accordance with the earlier will. On the will being offered for probate, it was contested by the disinherited children, and from an order admitting it to probate they appealed to the circuit court. *Held,* that the proponent was not obliged to bring suit in equity to enforce the agreement, but was entitled to have its validity and effect determined in the probate appeal.

MOORE, J., dissenting.

Error to Jackson; Peck, J. Submitted April 13, 1905. (Docket No. 64.) Resubmitted January 2, 1906. (Docket No. 1.) Decided July 3, 1906.

Elmore J. Bean presented for probate the last will and testament of John H. Bean, deceased. The will was allowed in the probate court, and Sinkler C. Bean and others appealed to the circuit court. There was judgment for contestants, and proponent brings error. Reversed.

*Charles E. Townsend,* for appellant.

*Richard Price* and *John W. Miner,* for appellees.

MOORE, J. John H. Bean was born February 13, 1820. He was the father of the parties to this litigation. His wife died in 1891. After that his son Elmore lived with him until the time of his death, which occurred prior to June 29, 1901. As early as 1897 he made deeds of his real estate to his various children and left them with a lawyer to be delivered after his death. On the 20th of December, 1898, he took up these deeds and executed a will consisting of nine pages, in which he disposed of upwards of 500 acres of land, some village and city real estate, and a quantity of personal property. In this will he remembered each of his children in a substantial way, but giving to his son Elmore more than to any of the others, stating in the will:

"I desire it understood that I have given this liberally to my said son Elmore for the reason that he has lived with me for a number of years and is now living with and caring for me and has done much for me, for which he has received no compensation."

July 28, 1900, he made a new will revoking the former one, and, after making a small bequest to his son John C. Bean, he gave all the rest of his property to his son Elmore. The value of the estate is estimated to be from $20,000 to $25,000. After his death the following agreement was drawn:

"Whereas, in his lifetime, John H. Bean made two wills, both of which are in existence, disposing of all his earthly effects; and

"Whereas, the last of said wills gave everything of which he died seised to Elmore J. Bean and John C. Bean; and

"Whereas, there is dissatisfaction among the other heirs of said John H. Bean over the terms of said last will and testament; and

"Whereas, some of the heirs of John H. Bean claim that the first of said wills in point of date should be declared the last will and testament of John H. Bean:

"Now, therefore, it is hereby mutually agreed by and between Celinda S. Culver, John C. Bean, Sinkler C. Bean, Elmore J. Bean, Nolan S. Bean, all the heirs of said John H. Bean, deceased, that both of said wills shall be filed in the office of the judge of probate for Jackson county, and that the later of said wills shall be probated, but that all of the property of said John H. Bean shall be finally distributed according to the provisions of said first will and testament, except, * * * and within ten days after the admission of probate of said later will Elmore J. Bean and John C. Bean shall make any and all conveyances necessary to carry out the provision of this agreement.

"It is further agreed that the property which eventually, under this agreement, is to go to the respective heirs shall and may be taken and occupied from this date, the same as though this agreement was now completed, and in case, for any reason, this agreement is not completed, then such occupation and possession shall in no manner confer any additional right upon such occupant.

"Witness our hands and seals this 29th day of June, A. D. 1901.

> "CELINDA S. CULVER.
> "JOHN C. BEAN.
> "SINKLER C. BEAN.
> "ELMORE J. BEAN.
> "NOLAN S. BEAN."

This agreement was duly witnessed and acknowledged. The will was offered for probate in the probate court. Its allowance was contested, but was allowed by the judge of probate. An appeal was taken to the circuit court, a trial was had before a jury which disallowed the will. The case is brought here by writ of error.

The circuit judge before whom the case was tried was the late Erastus Peck. There were a great many witnesses sworn. The record contains nearly 400 printed pages, with 40 assignments of error. So many of the assignments of error relate to the charge of the judge, or his failure to charge, that we deem it advisable to quote here very liberally from his charge, as follows:

"Two general questions are presented to the jury for consideration in determining the controversy now before you: *First*, whether the testator, John H. Bean, was of sound mind at the time the will in question was executed; and, *second*, whether the will was procured by undue influence.

"Upon the first of these propositions the proponent, Elmore Bean, has the burden of proof, and the question for your decision accurately stated is this: Has the proponent proven upon this trial by a preponderance of the evidence that at the time the proposed will was executed, July 28, 1900, the testator, John H. Bean, was of sound mind, as that term is used in the statute of this State relating to wills. Now this inquiry relates to the precise time when the will was executed, July 28, 1900. It is immaterial what may have been the condition of his mind at any other time before or afterward. The question here for your determination is whether at the very time the will was executed the testator was of sound mind. Nor does the question relate to wills generally. It only applies to this particular will. The inquiry is, Was Mr. Bean mentally competent to make the will in controversy?

The law of this State provides that every person of full age and sound mind may make a will. Mr. Bean was of full age. Was he also of sound mind ? That is, Did he have sufficient mental capacity to make this will ? Now, if Mr. Bean did have sufficient mental capacity to make the proposed will, if his mind was sound when the will was made, he had a legal right to dispose of his property as he saw fit. The law does not require property to be disposed of equally among those who would be heirs in case of a man's death, but leaves every man who has a sound mind to dispose of his property as he chooses. The fact that he prefers one to another can have no bearing upon the validity of his voluntary and intelligent action. It concerns no one what his reasons may be for doing what he has a right to do. The court and jury have no right to substitute their judgment for Mr. Bean's in this case, or to pass upon the wisdom or justice of his reasons, whether they are wise or unwise, just or unjust. They are for him, and no one else, to determine, provided that when he executed this will he was of sound mind. and mentally competent to make it. On the other hand, if Mr. Bean did not have sufficient mental capacity to make this will, if his mind was not 'sound,' within the meaning of the statute, when the will was made, then the will is invalid and cannot stand, whatever may be its provisions. It is therefore very important that you should clearly understand what is meant by the term 'sound mind' as found in the statute of this State relating to wills. And, upon that subject, I now instruct you that if at the time he executed this will Mr. Bean had sufficient mental capacity to understand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, to know the number of his children and who they were, to keep these facts in his mind long enough to dictate his will without prompting from others, he had sufficient capacity to make the will. Mr. Bean had sufficient capacity to make the will, if when it was made he understood the business in which he was engaged, and the extent and value of his property, and knew who were his children who would be heirs at law if he made no will. Soundness of mind implies such a mental condition as enables the testator to understand and comprehend his act and all the conditions which would enter into its rational performance. It is not enough that he understands some of them, or a part of them, or

that he could form some rational idea upon some branch of the subject, but he must have mind enough to comprehend and understand the scheme, the general plan of the entire transaction. He need not be able at the moment to carry in his mind the details of his estate, but he must have a general comprehension of it, and of what he is doing, and the effect of the will he is making, and must at the same time be able to understand who his relatives are, and who are the natural objects of his bounty. He must be conscious also of the fact, in such a case as this, that he is making an unequal distribution of his estate among his children—is entirely disinheriting three of them.

"Average mental capacity at the time of the execution of the will is not necessary to its validity. A less degree of mind or capacity is requisite to execute a will than to make a contract covering the same subject-matter. Though the testator must understand substantially the extent of his property, his relations to others who may be, or naturally would be, the objects of his bounty, and the scope and bearing of the provisions of his will, and must have sufficient activity of memory to collect in his mind without prompting the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive as well their obvious relations to each other, and be able to form some rational judgment in regard to them, yet he need not have the same perfect and complete understanding and appreciation of any of these matters in all their bearings as a person in sound and vigorous health of body and mind would have. Nor is it required that he know the precise legal effect of every provision contained in his will. The will in question is not valid unless Mr. Bean not only intended of his own free will to make such a disposition of his property as the law contemplates, but was capable of knowing what he was doing, of understanding to whom he was giving his property, and in what proportion, and who he was depriving of it as heirs. To make him competent he must have had sufficient active memory to recollect in his mind, without prompting, the elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive their obvious relations to each other, and to form a rational judgment in regard to them. It is not sufficient in law that he had some memory when he made the will, or sufficient memory to answer familiar and usual questions.

"Now, the proponent here, Mr. Elmore Bean, claims that his father, the testator, at the time this will was made, was of sound mind and mentally competent to make it, and that he was free from any insane delusions which affected the provisions of the will. The contestants, being the other children of the testator, claim: *First*, that Mr. Bean was mentally incompetent to make the will; that when it was made he was not of sound mind; that his mind had become so weak and enfeebled by old age, sickness, physical infirmities, and other causes, that he was not a man of sound mind, within the meaning of that term as used in the statute relating to wills, and that this was his condition, independent of the question of the insane delusions as to the disinherited children, which they claim affected the will. *Second*, the contestants claim that when the will was made the testator was laboring under certain insane delusions which impaired his mind and made him mentally incompetent, and which led him to disinherit by his will three of his children—Celinda, Sinkler, and Nolan.

"Now, gentlemen, whether the testator, John H. Bean, was of sound mind, and so was mentally competent to make the will in question at the time it was made, independent of the effect upon his mind and the will of the claimed insane delusions, is a question of fact to be determined by the jury from all the evidence in the case bearing upon that subject. If you find from the evidence that he was of sound mind, you should not defeat the will for this reason. On the other hand, if you do not determine from the evidence, and by a preponderance thereof, that he was of sound mind at that time, your verdict should be for contestants.

"Upon the subject of delusions I instruct you that an insane delusion exists where a man persistently believes supposed facts which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however illogically, upon the assumption of their existence. Now, to give any matter which has been referred to in the evidence in this case the character of an insane delusion, and justify you in treating it as such in considering of your verdict, the supposed fact must have had no real existence; but Mr. Bean must have sincerely believed it to be true against all evidence and probability, and this delusion must have operated upon the will, must have had the effect to lead

Mr. Bean to make or omit some provision in the will which he would not otherwise have made or omitted.

"Now, gentlemen, it is obvious, in view of the evidence, that Mr. Bean may have been insanely deluded in many respects and as to many things which could not of themselves constitute a basis for defeating the will in question, because they did not affect the provisions of the will. If you find from the evidence that he was laboring under delusions of that character, you should not defeat the will for that reason, but should only consider these delusions in determining whether he was generally competent and was of sound mind when the will was made.

"Now, gentlemen, of the many delusions under which the contestants claim Mr. Bean was laboring when he made this will, the only ones which could have affected its provisions are: *First* (and I state them substantially), that his son Nolan C. Bean was a dissolute man, who neglected his young children and had no regard for his father and was only waiting for his father to die to get some of his estate; *second,* that his son Sinkler Bean had dealt dishonestly with him, had cheated him out of his share of the crops grown on the land which Sinkler worked on shares, was owing him a large amount of money and would not pay him, and was scheming to get his property; *third,* that his son-in-law, Louis Culver, had sold certain cattle belonging to Mr. Bean without his authority and refused to turn over the proceeds to him and was trying to cheat him out of their value, and that his daughter Celinda, wife of Mr. Louis Culver, had taken her husband's part in that matter and was aiding him in carrying out that scheme. Now, gentlemen, if you find from the evidence that when the will was made the testator, John H. Bean, sincerely believed that it was true that his son Nolan C. Bean was a dissolute man, who neglected his young children and had no regard for his father, and was only waiting for his father to die to get some part of the estate, or if you find from the evidence that at the time Mr. Bean made the will he sincerely believed that his son, Sinkler Bean, had dealt dishonestly with him, had cheated him out of his share of the crops grown on the land which Sinkler worked on shares, and was owing him a large amount of money and would not pay him and was scheming to get hold of his property, or that his son-in-law, Louis Culver, had sold certain cattle belonging to Mr. Bean, without his authority, and refused to turn over the

proceeds to him and was trying to cheat him out of their value, and that his daughter Celinda, wife of said Louis Culver, had taken her husband's part in that matter and was aiding him in carrying out that scheme, and if you find also from the evidence that these supposed facts had no real existence except in the imagination, perverted, of Mr. Bean, and that Mr. Bean's belief in them was against all evidence and probability, and that Mr. Bean, the testator, acted upon the assumption that they were true and in his will disinherited Celinda, Sinkler, and Nolan for that reason, then the will should not be allowed to stand, and your verdict should be for the contestants. But, if you do not so find, the will should not be defeated on the ground that Mr. Bean was laboring under insane delusions when the will was made. What the truth is on this subject you are to determine from the evidence in the case. The proponent contends that the facts upon which this instruction is based are not proven, and he claims specially that neither Celinda, Sinkler, or Nolan were left out of the will for these reasons, or any of them, but that a more efficient reason—one reason operating on the mind of Mr. Bean at the time the will was made—was this, that Sinkler had only recently before that time launched proceedings in the probate court of this county to have a guardian appointed for his father, and that the other children, except himself, had taken part in aiding Sinkler in that proceeding; that their conduct in that matter was one of the moving causes which led the testator to omit them entirely in making the will, and that the claimed delusions to which I have referred has nothing to do with it. Now, gentlemen, if Mr. Bean disinherited these children because of their conduct in the guardianship proceedings in the probate court, and connected therewith, he cannot be considered as laboring under an insane delusion in that regard, because there was some rational basis of fact for his belief that they had tried to get a guardian appointed for him. Sinkler had signed the petition and the others, at least by waiving notice of the hearing, had facilitated the proceeding. Now, if Mr. Bean disinherited his children for that reason, whatever else may be said of his conduct, it certainly cannot be said that he was laboring under an insane delusion in that regard.

" Now, gentlemen, under these instructions I leave you to determine the question whether or not the proponent has shown, and by a preponderance of the evidence, that

Mr. Bean was, on the 28th of July, 1900, when this will was made, of sound mind within the meaning of the law as already explained to you in these instructions. If you find that he was not, your verdict should be for the contestants, without other considerations being taken into view. If you find that he was of sound mind, you will consider other branches of the case, to which I now call your attention.

" The second general proposition in the case is the question of undue influence. The contestants here claim that this will was procured by the exercise of undue influence upon the testator, Mr. Bean, by Elmore Bean, one of the sons. The proponent, Elmore, denies that this is true, and insists that the will was the product of his father's mind voluntarily and intelligently exercised, and without undue influence from him or anybody else with whom he was connected. Upon this position the contestants have the burden of proof, and the question for the jury, accurately stated, is this: Have the contestants shown by a preponderance of the evidence that the will in question was procured by the exercise of undue influence upon Mr. Bean. I instruct you that it cannot properly be said that the will was procured by undue influence merely because there was opportunity afforded for the exercise of such influence. The fact must be established by the evidence that there was undue influence exerted which operated upon the mind of the testator, and as a result produced the will in question. But this may not be, and rarely is, proved by direct evidence. The fact may be inferred from the facts and circumstances surrounding the testator at the time the will was made and before, and in this case you should consider in determining this question all the facts and circumstances surrounding Mr. Bean at the time and before the will in question was made. The influence exercised in procuring the will to be made, which the law condemns as undue, must be an improper and unlawful influence. Any proper and lawful influence in procuring the will to be made does not invalidate the will. Such influence is not condemned by the law. On the other hand, all proper influences are permitted by the courts. It is only when the alleged influence is improper and unlawful that it destroys the will. The undue influence, to vitiate the will, must have been operative at the very time the will was made, in this case on July 28, 1900. It may not have been exerted at that particular

moment. It may have been exerted before that time, but Mr. Bean must have been laboring under its influence, and it must have been operative at the time the will was made in order to vitiate the will, and the provisions of the will must have been affected by the undue influence. Undue influence sufficient to set aside a will depends to some extent upon the physical and mental condition of the testator. The two are usually intimately connected. What would amount to undue influence when the testator is in a condition of mental weakness might not be sufficient where he was physically strong and in full possession of his mental faculties, and so here, in determining the question whether this will was the product of undue influence exerted upon Mr. Bean by Elmore, his son, you should consider the mental and physical condition of Mr. Bean at the time the will was made. Undue influence, influence of the improper and unlawful character necessary to defeat a will, must be such as to destroy freedom of action on the part of the testator at the time the will was made. As I have said, it may have been exerted before that time, but its operating influence must have continued and resulted in the making of the will. Influence cannot destroy a will, unless it amounts to a degree of constraint such as the testator is too weak to resist, and which deprived him of his free agency, and prevented him from doing as he pleased with his property. Influence obtained by deceit, misrepresentation, flattery, importunity, superiority of will, mind, or character, or by what art soever human ingenuity of cunning may employ, which gave dominion over the will of the testator to such an extent as to destroy free agency on his part, constrained him to do against his will what he is unable to refuse, is such influence as the law condemns as undue when exercised by any one immediately over the testamentary act, whether by direction or indirection, or obtained at one time or another. Pressure of whatever character, whether acting on the fears or the hopes, if so exerted as to overcome the will and desire of the testator, without convincing his judgment, is a species of restraint under which no valid will can be made. Importunity or threats such as the testator has not the courage to resist, or moral command asserted, and yielded to for the sake of peace or quiet, or of escaping from distress of mind or social discomfort, these, if carried to a degree in which the free play of the testator's judgment, discretion, or

wishes is overborne, will constitute undue influence, although no force is used or threatened. On the other hand, influence obtained by any person over the testator by modest persuasion or argument addressed to the understanding, or by mere appeals to the affections, cannot be properly termed 'undue influence' in the legal sense.

"Advice, persuasion, and argument cannot vitiate a will made freely from conviction, although such a will might not have been made but for such advice and persuasion. Mr. Bean was not unduly influenced by his son Elmore, unless Elmore deceived or defrauded him, or exercised such mastery over his will as deprived him of free agency.

"Now, gentlemen, you will apply these instructions to the facts in the case as you may find them from the evidence, and reach a conclusion upon that subject. Unless you find that the contestants have shown, and by a preponderance of the evidence, that this will was procured by undue influence exerted by Elmore Bean upon his father, the testator, the will should not be set aside for that reason, and, if you do so find, your verdict should be for the contestants.

"Now, gentlemen of the jury, these two general propositions, as I have stated them to you, present questions of fact to be determined by the jury from the evidence in the case. You are the judges of the weight and credibility of the evidence. It is your province to determine what the facts are from the testimony which is put before you. You must exercise your judgment in the best way you can in determining how much faith and credit is to be given to the testimony of every witness, and to determine as well how much force as proof should be attached to every fact and circumstance put before you in the evidence. This duty you will perform in this case fearlessly and intelligently, but proceeding cautiously, fairly, impartially, and justly under your oaths as jurors, and basing your conclusions upon the evidence given in open court and the law as contained in these instructions, and upon these alone.

"In addition to the general charge I give you now additional instructions upon some of the special features in the case and the evidence suggested by or embodied in some of the very numerous requests to charge submitted. You may observe that some of the requests which the court will give you appear to be repetitions of principles

already included in the instructions. When that is the case I do not include them in the charge for the purpose of giving that portion of the instructions undue emphasis beyond what you give to all the instructions contained in the charge; but, in accordance with our practice to embody in the charge instructions applicable to the case in the language of counsel, so far as the court can do so, and also to adapt the instructions to special and peculiar features in the case as disclosed by the evidence.

" The proponent's second request I give you as follows: 'If you find that Mr. Bean was mentally competent on the 28th of July, when he actually made the will, you should sustain the will upon this point, even though you should find that he was mentally incompetent upon other occasions. The testimony as to incompetency upon other occasions can only be used in determining what his mental condition was on July 28, 1900. You should keep in mind that you are to find what his mental condition was on July 28th, at the very time when the will was executed.'

" Third: 'I charge you that, if you find from the evidence that Mr. Bean was mentally incompetent to execute this will the greater portion of the time during the year of its execution and several years before, and should also find that he had lucid intervals when he was competent to execute it, and that he did execute it during such a lucid interval on July 28, 1900, you should sustain the will as far as mental capacity is concerned. '

" The seventh in part as follows: 'You have no right to use any declarations or statements claimed to have been made by John H. Bean as a basis for a verdict establishing undue influence. You are not at liberty to find that Elmore exerted undue influence over his father from his father's statements. You must find such undue influence, if you find it at all, from other evidence outside of his father's statements.' To which I add: 'That such statements and declarations may be considered by you as bearing upon Mr. Bean's state of mind, and tending to show the effect of the alleged undue influence upon him. They may be used to establish everything pertaining to the testator himself, but not to show an act of influence.'

" The proponent's eighth request refers to the matter of the action of the probate court in the guardianship proceedings had before him. Upon that subject I instruct you: 'That it appears from the evidence that, a short

time before the will in question was made, proceedings were instituted in the probate court of this county for the appointment of a guardian for Mr. Bean, the testator, and that, after the taking of testimony, the probate judge made an order dismissing the petition. I instruct you that Mr. Bean's mental capacity to make a will was not involved in or determined by those proceedings in the probate court, and the decision of the probate judge in that case should have no effect upon your minds in determining the questions of fact submitted to you in this case. It is, however, proper for you to consider what the evidence shows occurred there, as a part of Mr. Bean's history; it occurring so near to the time of the making of the will in question, and also as throwing light upon his actions and conduct about that time, and from then up to the time the will was made.'

"Fourteenth: 'Sanity is the rule, insanity the exception, and, when it appears that a witness has known a person for a long time and has never known anything unusual either in his speech or action, the witness is competent to express an opinion that the person is of sound mind. Insanity (unsoundness of mind) not being a normal condition, before one is competent to say that another is insane, he must state some facts that are inconsistent with sanity. Therefore I charge you that the value of opinions by laymen as to incompetency depends largely upon the particular facts stated by them which are inconsistent with competency, while the opinions of physicians as to competency do not have to be based upon any particular transactions.'

" The fifteenth, as modified: ' Delusions upon particular subjects do not render a man incompetent to make a will, unless they affect the provisions of the will. If therefore you should find that generally Mr. Bean was possessed of delusions as to certain subjects, such as buying a church, seeing Milwaukee from Chicago, seeing a village 40 miles away, or any other delusions, if you should find they existed, you should not on account of those delusions find that he was incompetent to make the will in question, unless you further find that such delusions affected the provisions of the will.'

" The last part of the sixteenth is correct, and I give you as follows: ' The will should not be set aside merely because Mr. Bean was weak, or sometimes foolish, or lacked the average mental capacity of his neighbors, or

did not dispose of what was his own as others might think he ought to have done.'

"Seventeenth: 'One whose mind is perverted by insane delusions with reference to one or many subjects, however unreasonable and absurd, may nevertheless make a valid will, provided the provisions thereof are not influenced by such delusion, and he is otherwise competent and not unduly influenced by others.'

"Twenty-second: 'Mere unreasonable prejudice against the children omitted from his will would not render Mr. Bean incompetent to make the will.'

"Twenty-fourth: 'Undue influence, to destroy the will in this case, must have been exerted to obtain the will, and have been its moving cause, and you would not be justified in finding a verdict against this will because of undue influence, if any, exercised for other purposes, which was not operative at the time the will was made.'

"Twenty-sixth: 'The value of testimony depends upon the credibility of the witnesses, their opportunities for knowing and understanding the facts and circumstances about which they testify, and their intelligence.'

"Thirtieth: 'You have no right to render a verdict against the will in question because of prejudice against Elmore because he obtains what you may regard as an unjust portion of the property, and because you do not approve of his treatment of his father or sister and brothers; but the sole basis of a verdict against the will must be a conscientious conviction founded upon the evidence in the case, either that Mr. Bean was not competent to make the will July 28, 1900, or that it was obtained by undue influence.'

"Thirty-sixth, thirty-seventh, and thirty-eighth: 'Want of testamentary capacity is not established merely by evidence that the testator in the latter years of his life was not always cleanly, that he was partially blind, sometimes got lost, and that he acted childishly. Old age does not of itself disqualify a person to make a will. Eccentricities or peculiarities of the testator do not alone show incapacity to make a will.'

"Fortieth: 'Undue influence cannot be predicated (that is based upon) opportunity alone, nor upon conduct in the line of filial duty, nor upon the disposition of property not in accordance with the statute of descent.'

"Of the contestants' request to charge, I give you the second, in part as follows: 'In determining the question

of capacity to make a will, it is proper for you to consider all the testimony bearing upon the condition of the property and surroundings of the testator, and also the provisions of the will itself, as well as the fact that he had made a former disposition by deed of his property, in which he had remembered all his children.' And I may also add that it is proper for you to consider the fact that he had made a previous will, and to consider as well the terms of that will.

"Third: 'The fact that the testator had sufficient mind and memory to be able to answer usual and familiar questions, and carry on ordinary conversation, or that he was able to transact simple and customary business matters, does not conclusively show that he had sufficient mind and memory to make the proposed will; but in this case the question is for the jury to say, considering all the evidence as to the condition of the testator and his surroundings, looking to the provisions of the will itself, and the circumstances under which it was made, whether or not he did have sufficient active memory and sufficient mental capacity to make the will understandingly, without being prompted by others.'

"Ninth: 'You have a right to consider the nature and character of the will itself in the light of his surroundings, the number of his children, and the claims which they would naturally have to recognition, and, where a will or any of its provisions are contrary to natural justice, these should be considered by the jury in connection with the other facts in the case in determining whether or not the testator was of sound mind.'

"Tenth: 'You are at liberty to take into consideration whether or not the claims which children naturally have upon a parent have been disregarded in this case, and, if you find that to be the case, you are to consider that fact in connection with the other circumstances and evidence in the case and give it such weight as in your judgment you think it entitled to in determining whether the testator was, at the time the will was executed, of sound mind.'

"A part of the thirteenth: 'In considering the weight to be given to the testimony of the various witnesses who have testified as to the mental condition of the testator, John H. Bean, you should consider the circumstances under which they came in contact with him and the things which they related as having been done or said by Mr. Bean in their presence and the extent of intimacy and of their acquaintance with him.

"Seventeenth: 'Undue influence is any improper or wrongful constraint or persuasion whereby the will of a person is overpowered and he is induced to do an act which he otherwise would not do. Importunities, threats, misrepresentation, which the testator either has not the courage to resist or the judgment to discern and disregard or moral command, assented to for the sake of peace and quiet, these, if carried to a degree in which the free play of the testator's judgment, discretion, or wishes are overborne, will constitute undue influence, even though no force be used or threatened.'

"Eighteenth: 'Mere acts of genuine kindness or attention do not constitute undue influence, but where a testator's mind has been prejudiced or poisoned against those who would be the natural objects of his bounty, by means of misrepresentations conveyed to him by an interested person, so that the mind of the testator is changed, and he makes a disposition of his property by will in favor of the one conveying such misrepresentations, which he would not make were it not for such misrepresentations and fraud, then such a will is procured by undue influence and ought to be set aside.'

"Nineteenth, modified as I shall now give it: 'In considering the question whether or not undue influence was exercised over the testator, John H. Bean, by his son Elmore J. Bean, you have a right to take into consideration all the testimony shows in regard to the relations between Elmore and his father and their manner of living together during the testator's last years, the extent to which Elmore had charge of the money, and the testator's confidence in and reliance upon Elmore in their mutual dealings and in the testator's business transactions with others, the relations between the other children and their father from time to time, and all the other facts and circumstances bearing upon the conduct of Elmore and his relations with his father which would enable you to determine this question.'

"Twentieth: 'You should also take into consideration the mental and physical condition of the testator, John H. Bean, in determining the question of undue influence. You have a right to consider whether or not his condition was such that he could be easily influenced or his judgment changed, and also all that the testimony shows, if anything, in regard to his being a man who could be easily prejudiced, because undue influence may be exercised by

catering to the prejudices of a testator as well as by unlawful persuasion.'

"The request marked 'B' with slight modification: 'There has been introduced in evidence a paper which was signed by all the heirs subsequent to the death of their father. Now I instruct you that it is only proper for you to consider this paper in so far as it may aid you (if it aids you at all) in determining the questions of the competency of John H. Bean to make the will, and whether or not he was unduly influenced by his son Elmore. The validity of that agreement, or its legal effect between the parties signing it, is not involved in this controversy, and you should not consider it, except so far as it may tend to throw light on the questions submitted to you on this trial or aid you in determining the credibility of the witnesses in the case.'

"If you are satisfied, under the instructions which I have given, that the testator, John H. Bean, did not have sufficient mental capacity to make this will at the time it was made and executed by him, or if, having such capacity, that he was unduly influenced in the making of it by his son Elmore Bean, then the will should be rejected, regardless of this agreement or any agreement contained therein between the parties to this case.

"I further charge you, gentlemen, with reference to that portion of the testimony which consists of the opinion of witnesses, laymen, and experts, as to the mental competency of John H. Bean, that as to laymen, unprofessional witnesses, the opinion of the witnesses that the testator is sane, of sound mind, is competent where it appears that the witness was well acquainted with the testator, and had never seen anything unusual in his speech or actions; but before 'a witness can express an opinion that the testator was insane or unsound in mind, he must testify to something the latter said or did fairly tending to show insanity. Now all these opinions, whether given by physicians or laymen, are advisory merely. They are not conclusive upon the jury. Their weight depends, other things being equal, upon the facts and circumstances they relate as the basis of the opinion they express, or the extent and intimacy of their acquaintance with the testator. That is, they are required to state that, so that the jury may see what foundation exists for the opinion they express, and so be better able to judge of the value as evidence of their opinions. In this case it is your duty to consider these

opinions, and give them just such weight as you think they are fairly entitled to, and no more, in connection with all the other evidence bearing upon the question of the mental soundness and competency of Mr. Bean to make this will at the time it was executed."

Assignments of error 1 to 6, inclusive, relate to the action of the court in permitting laymen to express opinions as to the mental competency of the testator without having established a sufficient foundation for such opinions. Counsel insist none of the opinions allowed were admissible, and that this is particularly true of the opinion of Fred R. Bean, claiming his opinion was based on hearsay, and not upon personal knowledge, citing *Page* v. *Beach*, 134 Mich. 51. The case cited and the one at bar are quite dissimilar. In the former case, a witness whose acquaintance with the testator was limited to half an hour was allowed to testify to his competency to make a will. In the case at bar the witness was related to, and was well acquainted with, the deceased. He sat up nights with him during the winter of 1899 and 1900, had frequent talks with him upon a good many subjects, noticed that he wandered in his mind and rambled in his talk. He testified:

·" It seems to me I noticed a change in the old gentleman's mental condition during the last years of his life. It was more noticeable after the death of his niece, Hattie Bean, which I think was somewhere about 1898. I thought the old gentleman failed both physically and mentally quite fast."

And, in answer to the question "During the years of 1898 and 1899, in what condition was his mind, in your opinion?" answered, " His mind seemed so weak to me most of the time." The witness was not asked, and did not express any opinion, as to the competency of the testator, except as it was drawn out on the cross-examination. We do not think these assignments are well taken.

Assignments 10 and 20 relate to the legal effect of the writing called an agreement of settlement, signed soon

after the death of the testator. It is claimed that by virtue of this agreement contestants are estopped from making the contest; counsel citing a number of cases to be found in their brief. Upon the part of the contestants, it is said:

"This agreement, it will be observed, is peculiarly worded, and shows upon its face that it is incomplete, and provides as follows:

"'In case for any reason this agreement is not completed, then such occupation and possession shall in no manner confer any additional right upon such occupant.'

"Before the agreement was signed the question was asked Mr. Townsend, who represented Elmore, what that clause meant, and he stated:

"'It means that, if any of you fellows want to back out, you don't get any title under this agreement.'

"The agreement was repudiated by the parties, and it was not until the case reached the circuit court that proponent sought to take advantage of it. In the probate court there was no objection raised as to the right of the contestants to contest the will, and nothing was claimed for this so-called agreement. If appellant desired to avail himself of this agreement, and really believed that it was intended to be given the effect claimed for at the hearing in the circuit court, his remedy, and his only remedy, was to apply to a court of equity to restrain the contestants from contesting the will. As was said in the case of *Shurte* v. *Fletcher*, 111 Mich. 84, 99:

"'The probate court would not have power to decree a specific performance of the agreement made by the parties, if it was a valid one, and they refused to carry it out; neither would it have the power to set aside the agreement and cancel it, if it was invalid.'"

The briefs of counsel do not inform us when this question was raised in the trial court. We are unable to say from our examination of the record, except as we may infer it from the remarks of the trial judge in disposing of the motion which he did after all the evidence was in. His remarks indicate the question was not raised until the case was near an end. The testimony was very conflicting in relation to the circumstances under which this

agreement was made. Some of the witnesses insisted that important facts were withheld from them, which good faith made it the duty to disclose before the agreement was signed, and that it would not have been signed if the facts had been disclosed. We do not think it was error, under all the circumstances shown by the record, to refuse to hold that the agreement was a bar to contesting the will.

The twelfth, thirty-first, thirty-second, and thirty-fourth assignments raise the question whether the declarations of one of two devisees are admissible to show undue influence or mental incompetency where the other devisee is contesting the will. Counsel contend such declarations are not admissible, and cite the cases of *O'Connor* v. *Madison*, 98 Mich. 183, and *In re Estate of Lafevre*, 102 Mich. 569. In *O'Connor* v. *Madison*, supra, the writer of the opinion, speaking for the court, said: "We think that the rule does not extend to cases where there are several interested in sustaining the will as in this case" —clearly recognizing by implication that, if but one person was interested in sustaining the will, his admissions might be shown, and such we understand to be the rule. See *In re Estate of Lambie*, 97 Mich., at page 54, and the many cases cited. In this case the only person who desires the will to be sustained, and who will profit by having it sustained, is Elmore Bean. One of the first witnesses offered on the part of the proponent was Elmore Bean, who, in response to questions put to him by his counsel, testified:

" I have never said anything to father to prejudice him against the other children. I never advised him as to the disposition of his property. I never knowingly attempted to exercise any influence over my father to the detriment of my brothers or sister."

We think the testimony of his admissions was clearly competent.

The thirteenth and fourteenth assignments of error relate to permitting Sinkler Bean to testify to statements

made by the probate judge when the application to appoint a guardian for the testator failed. These proceedings were had shortly before the last will was drawn. The proponent introduced them in evidence, and had the probate judge sworn against the objection of the contestants, who stated they were willing to concede the proceedings were commenced in probate court and an order made disposing of them. The object of introducing this testimony on the part of the proponent was twofold: *First*, to show why testator changed his will, giving nothing to the children who instituted the guardianship proceedings; and, *second*, to show that these proceedings failed after a judicial inquiry, and to have the jury infer therefrom that they failed because the probate judge found as a matter of fact that John H. Bean did not need a guardian but was competent to do his own business.

It was the claim of contestants that it did not fail for any such reason, but that, after the probate judge had announced that he thought a guardian ought to be appointed, and advised the children to agree upon some one, that then Elmore made such promises in relation to the future care of his father that it was agreed the guardianship proceedings should be dismissed. Under this situation we do not think it error to admit the testimony.

The fifteenth and sixteenth assignments of error relate to testimony drawn out on the cross-examination of Grove H. Wolcott, a lawyer, who was offered as a witness by the proponent, who testified to a conversation he had with the testator in the summer of 1899 in relation to instituting proceedings to enjoin certain mill owners from maintaining a dam that testator thought injured him, which conversation resulted in an injunction bill being drawn. The witness testified:

"I thought Mr. Bean understood what he was doing. I had no doubt about that. He understood that he wanted this bill filed to enjoin them from keeping their water upon the land, and I should have had him swear to it without any hesitation. Mr. Miner and I went to his

place, and he refused to sign it, giving the reason that Mr. Miner was just as much interested as he was, and Mr. Miner ought to go ahead with it, that he had either talked with the boys or would, and let us know the following Monday. * * * Mr. Bean would have had to have been sworn before signing the bill. I read the bill over to him, and it would have been necessary for him to have sworn that the bill had been read to him and he heard it, as it was an injunction bill; that he knew the contents. I thought he had sufficient capacity to make that oath when we went out there. Afterwards my confidence was somewhat impaired, but, if he had sent it in the next day sworn to, I would have gone on with the case. He could not have intelligently made the oath without understanding the contents of the bill."

On the cross-examination the following occurred:

"*Q.* Now, Mr. Wolcott, do you think he had sufficient mind to make an intelligent disposition of his property, naming his different items of his property and location, and the fact that he had five children, from his condition that you found him that day?

"*A.* I would have some doubt in my mind upon that proposition.

"*Q.* I want to ask you whether or not, in your judgment, it would require a greater degree of mental capacity to make such a will than to sign such a bill as has been introduced here?

"*A.* Why, it would, in my opinion."

It is very clear that the purpose of the proponent in offering this testimony was to have the jury infer that this practicing lawyer thought the testator was competent to execute this legal document, and also to infer that, if he was competent to do that, he was competent to make a will. It was not a question of expert evidence as argued by counsel in their brief, but is one of whether it was proper cross-examination of a witness. We think it was.

The seventeenth assignment of error relates to the refusal of the court to give proponent's fourth request, as follows:

"If you find from the evidence that John H. Bean told Mr. Townsend to draw the will as it was drawn, and at

the time he told him, and when he executed it, he knew what he was doing and recalled to his mind at the time his property and his children and their claims upon him, then you will sustain the will so far as the question of mental competency is concerned."

Counsel say:

"This request to charge was based upon the case of *Spencer* v. *Terry's Estate*, 127 Mich. 425, and was a correct statement of the law as expounded in that case and should have been given."

A reference to the case will show the request omitted the following very important element:

"That he had sufficient mental capacity to understand the business in which he was engaged, to know and understand the extent and value of his property, and how he wanted to dispose of it, and to keep those facts in his mind long enough to dictate his will without prompting from others."

A reference to the general charge will also show the subject was fully covered.

The eighteenth assignment of error is based upon the refusal to give proponent's sixth request:

"If you find from the evidence that Mr. Bean omitted his daughter Celinda and his sons Nolan and Sinkler from his will because of their attempt to put him under a guardian, then you should not regard such omissions as reflecting upon his competency."

Counsel say:

"We submit that the efforts of his children to have the testator placed under the guardianship, as disclosed by the record, furnished an adequate motive for omitting them from his last will."

The question of adequate motive was not a question of law, but was one of fact to be decided by the jury under proper instructions, which we think were properly given them upon that subject.

Error is assigned as follows:

"The court submitted to the jury three alleged insane delusions of the testator, viz. :

"*First.* That his son Nolan C. Bean was a dissolute man who neglected his young children and had no regard for his father and was only waiting for his father to die to get some of his estate.

"*Second.* That his son Sinkler Bean had dealt dishonestly with him, had cheated him out of his share of the crops grown on the land which Sinkler worked on shares, was owing him a large amount of money and would not pay him, and was scheming to get his property.

"*Third.* That his son-in-law, Louis Culver, had sold certain cattle belonging to Mr. Bean without his authority and refused to turn over the proceeds to him and was trying to cheat him out of their value, and that his daughter Celinda, wife of Louis Culver, had taken her husband's part in that matter and was aiding him in carrying out that scheme."

It is argued there is no testimony to show these were insane delusions, as the testimony shows they were not. This portion of the charge should be read in connection with its context. The contestants had shown beyond any possible controversy that the testator did entertain many delusions that had no basis of fact. They also claimed that he entertained delusions in relation to his sons Nolan and Sinkler and his son-in-law Mr. Culver that were wholly unwarranted. They gave testimony tending to establish their claim. It was the purpose of this portion of the charge to limit the jury in their deliberations to a consideration of the testimony bearing upon the alleged insane delusions that were germane to the subject of inquiry. The learned judge was careful to abstain from expressing any opinion as to the evidence itself. When the portion of the charge quoted is read in connection with the rest of it, we think it a very proper presentation of the law upon that subject.

As to the other assignments of error, we have examined them carefully, and must content ourselves with saying we think they are not well taken. The case was very carefully tried by able counsel. It was impartially submitted to the jury in a charge of exceptional clearness.

The jury reached a result fully justified by the testimony offered on the part of the contestants.

Judgment should be affirmed.

OSTRANDER, J. I do not agree to the disposition made by Mr. Justice MOORE:

1. Of the questions raised by the appellant concerning the alleged insane delusions of the testator.

Counsel for proponent requested the court to charge the jury in manner following:

"Nineteenth: I charge you that there is no evidence in this case that Mr. Bean had any insane delusion with reference to any of his children. * * *·

"Twenty-first: I charge you that there is no evidence in this case from which you would be warranted in finding that the provisions of the will of John H. Bean, or any of them, were affected by any of the alleged insane delusions introduced in evidence."

The twenty-second request preferred by counsel for proponent was given, as follows:

"Mere unreasonable prejudice against the children omitted from his will would not render Mr. Bean incompetent to make the will."

He also said to the jury:

"Delusions upon particular subjects do not render a man incompetent to make a will unless they affect the provisions of the will. If therefore you should find that generally Mr. Bean was possessed of delusions as to certain subjects, such as buying a church, seeing Milwaukee from Chicago, seeing a village 40 miles away, or any other delusions, if you should find they existed, you should not on account of those delusions find that he was incompetent to make the will in question, unless you further find that such delusions affected the provisions of the will."

Statements like the foregoing, made in connection with those set out in the opinion of Justice MOORE in which attention of the jury is directed, or limited, to alleged particular delusions, affecting particular children, were calculated to accentuate and to invite attention to such

particular alleged delusions. The court left it for the jury to determine whether or not the particular delusions as to the particular children existed, saying to them that if they found from the evidence that the supposed facts had no real existence except in the imagination, perverted, of Mr. Bean, and that Mr. Bean's belief in them was against all evidence and probability, and that Mr. Bean acted upon the assumption that they were true and in his will disinherited Celinda, Sinkler, and Nolan for that reason, then the will should not be allowed to stand. The court, in my opinion, correctly stated the rule; but it is one which, applied to the testimony in the case, required that the whole subject should be withdrawn from the consideration of the jury, because the record negatives the idea that either of the alleged delusions, to which the attention of the jury was thus called, rested only in the imagination, perverted, of the testator.

The question is not whether, weighing the evidence for and against claims preferred by the parties, the father or the child made the better showing of real right. If it is once conceded that there is, as to the fact which is the subject of alleged delusion, a real controversy, no mere preponderance of evidence or of reason is sufficient to support an inquiry into the sanity of one reaching and declaring a conclusion or a belief concerning the merits of the controversy. The record clearly shows that, as to the second and third matters of alleged delusion to which the attention of the jury was called, the conclusions said to have been reached by the father were based upon real, and not imaginary, facts. The differences between the parties were such that, if concerning them a claim were presented either by the survivors or by the estate, the testimony of the son and the son-in-law, referred to, would of necessity be inadmissible to establish the truth of the controversy. As to the first matter, I do not understand how it can be determined that the opinion of a father that a son has no regard for him, and is waiting for him to die in order to get a portion of his estate, can be said to have

no foundation in fact, and to be the result of insane delusion, except it may be, in cases where relations, induced by a lifetime of dutiful conduct on the one side and of continued and known affection on the other, are suddenly and without known cause interrupted and succeeded by an attitude on the part of the father utterly inconsistent with past conduct. See *Haines* v. *Hayden*, 95 Mich. 332; *Rivard* v. *Rivard*, 109 Mich. 98.

It must be borne in mind that the father, in cases like the one before us, is not a party to the post mortem trial of the soundness of his opinions, and that the reasons for the opinions of men of advanced age lie, very often, far behind the expression of those opinions.

The court should have charged the jury as requested on the part of the proponent. As it was claimed on the part of the contestants that the will was invalid because the said alleged insane delusions operated to their disadvantage, and a general verdict was taken, it cannot be held that the error committed in submitting the matter to the jury was not prejudicial.

2. Testator made two wills. It is the last will which is in question here. After his death, all of his heirs at law executed and acknowledged an instrument, of which the following is a copy:

"Whereas, in his lifetime John H. Bean made two wills, both of which are in existence, disposing of all his earthly effects; and

"Whereas, the last of said wills gave everything of which he died seised to Elmore J. Bean and John C. Bean; and

"Whereas, there is dissatisfaction among the other heirs of said John H. Bean over the terms of said last will and testament; and

"Whereas, some of the heirs of John H. Bean claim that the first of said wills in point of date should be declared the last will and testament of John H. Bean:

"Now, therefore, it is hereby mutually agreed by and between Celinda S. Culver, John C. Bean, Sinkler C. Bean, Elmore J. Bean, Nolan S. Bean, all the heirs of said John H. Bean, deceased, that both of said wills shall be filed in the office of the judge of probate for Jackson

county, and that the later of said wills shall be probated, but that all of the property of said John H. Bean shall be finally distributed according to the provisions of said first will and testament, except that John C. Bean shall have a deed of a strip of land ninety-eight (98) feet wide east and west, and eight (8) rods deep on the south side of Mason street, in the city of Jackson, Michigan, on block sixty-seven (67) of Ford's addition to the city of Jackson, including the east two houses on said street, in addition to what the said former will gives him, and whoever under said earlier will gets said strip of land shall receive that much less, and within ten days after the admission of probate of said later will Elmore J. Bean and John C. Bean shall make any and all conveyances necessary to carry out the provision of this agreement.

"It is further agreed that the property which eventually, under this agreement, is to go to the respective heirs, shall and may be taken and occupied from this date, the same as though this agreement was now completed, and in case, for any reason, this agreement is not completed, then such occupation and possession shall in no manner confer any additional right upon such occupant.

"Witness our hands and seals this 29th day of June, A. D. 1901.

> "CELINDA S. CULVER.
> "JOHN C. BEAN.
> "SINKLER C. BEAN.
> "ELMORE J. BEAN.
> "NOLAN S. BEAN.

"In presence of
"CHAS. E. TOWNSEND,
"MAUD R. ROGERS.

"STATE OF MICHIGAN, } ss. :
County of Jackson. }

"On this 29th day of June, A. D. 1901, personally appeared before me, Celinda S. Culver, John C. Bean, Sinkler C. Bean, Elmore J. Bean, to me known to be four of the five heirs at law of John H. Bean, deceased, and each acknowledged that he signed the foregoing agreement of his own free will and accord and for the purpose therein mentioned.

> "CHAS. E. TOWNSEND,
> "Notary Public, Jackson County, Mich.

"STATE OF MICHIGAN, } ss. :
County of Van Buren. }

"On this 2d day of July, 1901, personally appeared be-

fore me, Nolan S. Bean, to me known as one of the five heirs at law of John H. Bean, and acknowledged that he signed the foregoing agreement of his own free will and accord.

                              "C. W. DAYTON,
                              "Justice of the Peace."

This writing was prepared after a conference between counsel representing the heirs. The proposition was made by the contesting heirs. It was executed by all excepting Nolan, at Jackson, and was sent to him for execution at his home. If any use was attempted to be made of this agreement upon the hearing in probate court, it does not appear. In the brief of counsel for contestants, it is asserted that no objection was made in probate court to the contesting of the will and nothing there claimed for this agreement. In the circuit court, after identification of the paper, and after its history had been given by the first witness sworn, the paper was put in evidence; the record also disclosing the following action:

"The postponed question with regard to the written agreement as a bar to the suit was then taken up, and argued at length by counsel for proponent.

"Upon Mr. Price rising to reply, the court said:

"*The Court:* 'I don't think I need to delay you in the matter any further, Mr. Price. The question presented is certainly a very grave one, and I dispose of it for the present as though it were raised in a timely manner so far as the trial here is concerned; that is to say, that it was raised as soon as the contestants attempted to do anything in the case here. There is grave doubt in my mind whether in this proceeding the court can try that question. I keep in mind the fact that our decisions, in harmony with many other jurisdictions, favor the settlement of estates by the heirs. Indeed our own courts go as far as most courts do in that direction. If we take up that question and try it out, involving the hearing of testimony, all the testimony that might be pertinent to determine whether or no this agreement was actually made, whether the parties made it freely, and whether it was proceeded under, whether or not it was under the facts shown as incident to it it was a valid agreement, and as has been suggested by Mr. Price, perhaps other fields would be open to testi-

mony, as to whether or not it was entered upon in good faith, and being carried out in good faith. Now, all that would certainly be something that we are not accustomed to in determining the question of the validity of a will. I am not saying that, because the question might be a troublesome or involved one, that the court should hesitate to take it up if it were properly here. I am only speaking of it to indicate that, if I may take the expressions of counsel for anything, there would be a good deal of a contest with reference to the validity of this agreement, and a good deal of evidence which the court has not now before it, so that I hesitate to hold so as to dispose of the case that the contest cannot be made by these contestants because of this agreement.

" 'Now, there is another thing about it. The trial of this preliminary question would be an involved and expensive department of the case. We are at present well along with the trial of the other questions raised by the contestants. Now, we can all see that, if the verdict should be in favor of the proponent, this question so far as this trial is concerned would have no significance, but only be appropriate for consideration and have any vital force if the contestants should succeed. Now, here is a very expensive and prolonged trial, and courts are obliged to take common-sense view of things, and in doubtful situations to give such a direction to the subjects considered as to make saving to the parties and the public as much as possible. So far as this question now presented to me it could be as well and properly and fully presented upon a motion for a new trial in case of a verdict in favor of the contestants. If the proponent should prevail, as has been said, we would have a condition which would make the question of no significance so far as this trial is concerned. Now I think that, in view of all the circumstances, that the better ruling for me to make to dispose of it is to decline to arrest the trial and hold that the defendants can proceed no further and direct a verdict for proponent, as I would have to do in that situation for this reason; and that will be the holding.' Exception noted by Mr. Blair."

The court, upon this subject, said to the jury:

"There has been introduced in evidence a paper which was signed by all the heirs subsequent to the death of their father. Now, I instruct you that it is only proper for you to consider this paper in so far as it may aid you (if it aids

you at all) in determining the questions of the competency of John H. Bean to make the will, and whether or not he was unduly influenced by his son Elmore. The validity of that agreement, or its legal effect between the parties signing it, is not involved in this controversy, and you should not consider it, except so far as it may tend to throw light on the questions submitted to you on this trial or aid you in determining the credibility of the witnesses in the case."

I do not understand that this agreement was repudiated by Elmore Bean. To probate the will is to perform the agreement. Certainly, it was on his behalf that the agreement was offered in evidence at the trial, and it was urged that the effect of it was to estop contestants from making any defense to the probating of the will. Nor do I agree to the proposition that proponent, if he desired the agreement to have effect, must seek the aid of a court of equity to restrain contestants from objecting to the probate of the will. The case of *Shurte* v. *Fletcher*, 111 Mich. 84, 99, is not, in my judgment, authority for such a proposition. In that case, a bill had been filed to set aside certain conveyances made in settlement of an estate pursuant to a writing in the form of a deed, by the terms of which all of the estate was, by the parties interested, conveyed to a trustee, to be by him partitioned and divided. Afterwards, and after conveyances had been made pursuant to the trust deed, petition was made to the probate court for appointment of an administrator of the estate, and such appointment was refused at the hearing because the estate had been settled. It was urged in the court of chancery that this ruling and action of the probate court was res adjudicata the validity of the agreement made by the heirs. This court held otherwise, saying:

" The probate court would not have power to decree a specific performance of the agreement made by the parties, if it was a valid one, and they refused to carry it out; neither would it have the power to set aside the agreement and cancel it, if it was invalid."

No question of specific enforcement of the agreement is

involved here. It is possible that in a given case complete effect cannot be given to a contract, because the court in which the case is pending has not complete jurisdiction. Assuming the validity of the agreement in question, it is in terms one not to contest the probate of the will here presented. No reason is apparent for holding that the circuit court is without power to give the instrument effect for this purpose. A covenant not to sue, the covenantee being sole debtor, may always be pleaded in bar of the action. So, if there are several debtors in whose favor, jointly, the covenant runs, such a plea may be traversed. In the case before us there is produced and put in evidence an agreement executed by all the parties in interest. In terms it is an agreement to have done the precise thing which proponent is seeking to do, and which the other parties are seeking to prevent. Is the trial court without power to discover the validity and determine the effect of the agreement? Instead of saying that proponent should apply to equity to enforce the agreement, why may it not be as well said that contestants should apply in that forum to set it aside, if for any reason it is considered to be invalid? It should not be supposed from what is here said that consideration is given to any question involving the construction of the agreement or the effect of the parol testimony offered concerning it. I am concerned only in resolving the doubt expressed by the trial judge. In my opinion, the court should have proceeded to a determination of the validity of the agreement and its effect for the purpose for which it was introduced.

For the reasons stated, I think the judgment should be reversed, and a new trial granted.

McALVAY, GRANT, and HOOKER, JJ., concurred with OSTRANDER, J.

MONTGOMERY, J. I concur in the reversal on the second ground stated in the opinion of Mr. Justice OSTRANDER.