No. 19,280.

CHARLES H. WISNER et al., *Appellees,* v. C. Q. CHAND-
LER et al., *Appellants.*

### SYLLABUS BY THE COURT.

1. WILL—*Contest*—*Testamentary Capacity at Time of Making Will to be Considered.* The time when a contested will was made is the time of primary importance to be considered in estimating testamentary capacity. Evidence of capacity and of want of capacity before and after that time merely aids the investigation.

2. SAME—*Manifestations of Symptoms of Senile Dementia Not Conclusive of Incapacity.* Evidence that a testator clearly manifested the symptoms of senile dementia before a will was made and that afterwards the mental reduction continued until the extreme degree of dementia was reached at the time of his death, which occurred approximately nineteen months later, is not conclusive of incapacity to make the will.

3. SAME—*Provisions of the Will May be Considered in Determining Mental Capacity of Testator.* It is proper to consider the provisions of a contested will as bearing upon the mental capacity or incapacity of the testator, and when it is established that a will was the product of the testator's unaided and uninfluenced mind, its character may be such that it affords highly satisfying evidence of testamentary capacity, although the testator may have been afflicted with senile dementia.

4. SAME—*Findings of Fact Establish Testamentary Capacity of Testator.* Findings of fact considered and held to establish the testamentary capacity of a man who made his will in

October, 1911, who died in May, 1913, at the age of eighty-eight years, and who at the time of his death had lost his mind through senile dementia.

Appeal from Barber district court; PRESTON B. GIL-LETT, judge. Opinion filed April 10, 1915. Reversed.

*H. C. Sluss, J. D. Houston, C. H. Brooks,* all of Wichita, *Samuel Griffin,* of Medicine Lodge, and *John Marshall,* of Topeka, for the appellants.

*A. M. Jackson, A. L. Noble,* both of Winfield, *J. N. Tincher,* and *S. I. Field,* both of Medicine Lodge, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to set aside the will of Henry Wisner, deceased, on the grounds of mental incapacity and undue influence. A jury was called to make findings upon those issues. The jury found that the testator was of sound mind, but that he was unduly influenced. The court set aside both findings, made findings of fact of its own, and concluded that the testator was not unduly influenced, but that he did not possess sufficient mental capacity to make a will. Judgment was rendered accordingly, and the executors and certain beneficiaries of the will appeal.

The parties have presented the case through the medium of 1240 printed pages of abstracts and briefs, and the decision has been delayed because of the demand their perusal made upon the court's time. The issue of fact, however, is simple, and the controlling principles of law are clear and easy of application.

In making findings of fact the court stated evidentiary facts from which its ultimate conclusion of testamentary incapacity was derived. It undertook to state all the principal facts indicating unsoundness of mind, including some which served merely to combat the inference of mental capacity. Facts warranting the inference of mental capacity were likewise found,

but twenty or more requests for further findings, out of a much longer list, based upon evidence indicating soundness of mind, some of which was undisputed and all of which was clear and highly probative, were denied. The result is the judgment can not be affirmed, because of the rule established by the decision in the case of *Nordman v. Johnson,* 94 Kan. 409, 146 Pac. 1125. The court is of the opinion, however, that the facts stated in the findings of fact do not warrant the inference of unsoundness of .mind, and do establish, to a moral and legal certainty, capacity on the part of the testator to make the will.

The evidence was wholly insufficient to establish the undue influence alleged, and the finding to that effect is approved. (*Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634; *Carmen v. Kight,* 85 Kan. 18, 116 Pac. 231; *Singer v. Taylor,* 90 Kan. 285, 133 Pac. 841; *Hopper v. Sellers,* 91 Kan. 876, 139 Pac. 365.)

The testator had been educated in medicine and was known as Doctor Wisner, although he never practiced. When a young man he married a wife who soon died. In 1850 he married again. Four children were born, only two of whom, Charles and Henry, the plaintiffs in the action, reached maturity. Charles is married and has children and grandchildren. Henry has always remained single. Doctor Wisner spent his wife's fortune and subsequently was adjudged to be bankrupt. The husband and wife became estranged, lived apart, and were so living at the time of her death, at which time a divorce action which she had instituted was pending. In 1875 Doctor Wisner married again, in 1880 came to Barber county, engaged with a brother in the cattle business, and acquired the nucleus of the large land holdings he possessed when he died.. He had great business ability and capacity, did business on a large scale, and accumulated an estate of approximately $100,000.

The sons, Charles and Henry, had been partisans of their mother, lived with her until her death, and after her death remained in Chicago. In 1886 Charles came to Kansas, proved up a claim, deeded it to his father, and returned to Chicago. At the solicitation of his father he returned to Kansas, with his family, in 1897. His father sold him eighty acres of land, taking a mortgage to secure the purchase price. This land Charles improved and occupied as a homestead. Part of the time Charles assisted his father, but usually he worked for his father for wages. Doctor Wisner and his wife lived on the portion of the ranch known as the "home place," and the two families mingled and associated in a natural way.

The son Henry resided in Chicago, except for some occasional trips to Kansas, until about five years before his father's death when he came to the ranch and remained there. How he happened to come and how he happened to remain is not disclosed. His relations with his father were friendly and natural except that after his stepmother's death in 1911 he precipitated a row with his father about his father's nurse, left the house, and stayed away for about six months. It seems that none of the managers of the trial cared for his testimony and he was not called as a witness.

In 1886 Doctor Wisner, his wife, and his brother made wills, each one willing to the other two all his property. In Doctor Wisner's will the sons, Charles and Henry, were given $100 each. In 1899 similar wills were made by the same persons, Charles and Henry being given the same sums as before by their father. In 1908 the brother died and his will was duly probated. Doctor Wisner and his wife then made wills to each other, Charles and Henry being given $100 each as before. Afterwards, because of the growing physical and mental disabilities of age, Doctor Wisner transferred all his property to his wife, who was twenty-three years his junior, and his business was then trans-

acted in her name, in consultation with him. They left the ranch, which lay in the vicinity of the town of Sharon, lived in Medicine Lodge about a year, and then built a house in Sharon into which they moved in the spring of 1910.

In March, 1910, Mrs. Wisner and Doctor Wisner deeded to Charles an undivided one-half interest in 800 acres of land, including the home place where Charles then lived. Charles at the same time reconveyed the eighty-acre tract which had been deeded to him, the unpaid mortgage being canceled. In January, 1911, the other undivided one-half interest in this 800-acre tract was deeded to Henry. The deed to Charles and the deed to Henry prohibited any sale or conveyance and any mortgage or other encumbrance by the grantee without the written consent of the grantors.

On October 7, 1911, the testator's wife, Sarah, died, and under her will the testator again became the owner of all the property which had been accumulated during their married lives. On October 9, the day of Mrs. Wisner's funeral, the testator executed what was called a codicil to his will, which recited the death of his wife and simply revoked the will of 1908. On October 19 the will in dispute was made. Two codicils to this will were made on December 1 and December 30, respectively. The testator lived until May 11, 1913. At the time of his death he was eighty-eight years old. The will was admitted to probate on May 15, 1913. The executors named in the will, C. Q. Chandler and T. L. Lindley, duly qualified, and on May 26 returned an inventory and appraisement of the estate. On June 18, the sons, Charles Wisner and Henry Wisner, instituted the action to set aside the will.

The testator suffered from the physical infirmities of age. He was feeble, quite deaf, and his vision was impaired. He had a leaky heart, arteriosclerosis, and a disease of the prostate gland. His physical condition, however, did not, considered alone, interfere with the

execution of his determination to make a will and the court predicated the invalidity of the will on unsoundness of mind.

The court concluded that the testator was the victim of senile dementia. Symptoms of the disease were found in detail, but not with discrimination as to time of manifestation. In the last few years of the testator's life he lost conception of time and of dates; suffered loss of memory of recent events; suffered from discontinuity of thought; was forgetful of the subjects of conversations, and of persons; would disclaim making statements and repudiate things he had done; in the midst of a conversation would leave recent events and take up incidents of his early life; acquired an aversion to family which he manifested toward his grandchildren; became boastful of property interests he did not possess; manifested a desire for publicity and made gifts to bring his name before the public; confided more implicitly in those he trusted so that he was easily influenced; at the time of his wife's death, which was due to a stroke of paralysis, appeared unmoved; would become lost in his own room; in time required the constant attendance of a nurse; and by the time of his death had totally lost his mind. In addition to this the court made the following finding:

"*Seventeenth:* . . . When in the last few years of his life, he was suffering from senile dementia, as above found, his knowledge of his real estate in the ranch, and the condition of his finance; the amount of money he had on hand and his other resources, were, on account of his strong business mind, the last to be shaken or affected. He had had the ranch for many years and knew it well by government descriptions, and to the last was able to describe it in that way and knew the improvements and conditions of the same, and while the disease shattered his mind, and rendered him mentally incapable he did retain an accurate description of his ranch and many of his business affairs and transactions though a hopeless victim of senile dementia."

From all the facts previously found the court stated the following conclusion of fact:

"*Eighteenth:* At the time of the execution of the will in question and the codicils thereto, the testator was old, weak, feeble and childish and of unsound mind. His mind and memory were so impaired that he did not possess an intelligent understanding of the disposition he desired to make of his property, or of the persons he desired should receive it, and did not possess the capacity to recollect and comprehend the nature of the claims of those who were excluded from participating in his bounty."

It will be observed that the eighteenth finding does not mention inability of the testator to comprehend the extent of his estate, when enumerating the missing elements of testamentary capacity. In the seventeenth finding capacity to do this far beyond the requirement of the law regarding mental capacity to make a will is revealed during the period when the testator was suffering from senile dementia, but the finding states that this capacity was that of one whose mind was shattered by the disease and who was mentally incapable. In another finding the court illustrated the condition of a person afflicted with senile dementia by saying that he may carry on business transactions in which no trace of mental derangement can be found, but that the disease is there and renders him irresponsible. While it is true that persons suffering from senile dementia may automatically perform matters of routine and of habit without comprehension of what they are doing, generally speaking, the law does not recognize such a state of mind as the court described. The seventeenth finding properly summarized a great quantity of evidence relating to the testator's knowledge of his extensive possessions and of his changing business affairs, which fully establish the existence of the strong business mind referred to until long after the will was made; and when such capacity exists the law recog-

Wisner v. Chandler.

nizes it and gives full effect to it as an element of testamentary capacity, even although the testator be afflicted with senile dementia.

The human family has watched the encroachment of mental decrepitude upon its elder members for a long time. Job said, "He . . . taketh away the understanding of the aged." People generally readily relate manifestations like those the court described to the ravages of time upon the mental faculties. Science has done but little more than give a name to the retrograde metamorphosis of the brain which causes this variety of senility, and therapeutically is quite helpless against the degenerative process which lies at the foundation of the disease. While the course of the disease is chronic and advances to a fatal end, it develops gradually and is quite variable in duration. It usually lasts several years, although a few acute cases have been observed. It is sometimes subject to remissions in which mental balance is regained. Defects of memory are the earliest symptoms, first, memories of recent things, and then older memories. Afterwards the power of intellectual comprehension and assimilation is lessened, the judgment begins to fail, ethical feelings degenerate, the will becomes weakened, coarser instincts acquire ascendency, hallucinations and illusions manifest themselves, and the mental reduction continues until the extreme degree of dementia is reached.

When a will has been made after some or many of the symptoms of senile dementia have been observed the law does not say, these symptoms prove the testator had senile dementia, senile dementia destroys the mind, consequently the will was made by one of unsound mind. The question of testamentary capacity remains in substance and effect just what it was in the *Marquis of Winchester's Case,* decided by the court of King's Bench at the Trinity term, held in the forty-third year of the reign of Queen Elizabeth.

"And because it appeared by divers witnesses, and by many notorious circumstances, that the said Marquess being sick *et multa provectus senectute,* was not of sane and perfect memory, such as the law requires at the time of the making of the said supposed will (for by law it is not sufficient that the testator be of memory when he makes his will, to answer familiar and usual questions, but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason; and that is such a memory which the law calls sane and perfect memory)." (*Marquess of Winchester's Case,* 3 Coke's Reports, 302, 77 Eng. Reports, Full Reprint, 287.)

In most instances arteriosclerosis takes part in the causation of senile dementia, and the precise principle involved is well stated in the syllabus of the case of *Brainard v. Brainard,* 259 Ill. 613, 103 N. E. 45, decided in October, 1913:

"Whether arterio-sclerosis has affected the mind of the testator is not a question which is settled by mere proof that the testator was afflicted with the disease and that the tendency of the disease is to affect the mind, but the question must be determined by the proof in the particular case." (Syl. ¶ 3.)

The following quotations are taken from will cases involving senile dementia.

"The term 'senile dementia' means that diminution and weakness of the mental faculties which result from old age, and it does not necessarily exclude the possibility of testamentary capacity in a person whose condition is so described." (*Graham v. Deuterman,* 244 Ill. 124, syl. ¶ 3, 91 N. E. 61.)

"There was senile dementia, not to a degree to invalidate her will." (*Succession of Jones,* 120 La. 986, 1010, 45 South. 965.)

"The theory of the proponents is that the record contains no evidence of general incompetency, the result of senile dementia or general insanity, or of an insane delusion which affected the testamentary capacity of Mr. Rivard. Counsel urged and requested the court to so charge, that Mr. Rivard was competent to attend to

his business affairs, to make deeds, leases, and contracts, and was therefore competent to make a will, for the reason that it requires less capacity to make a will than to execute deeds and contracts. If the alleged incompetency depended upon senile dementia or general insanity, counsel's contention, under the instruction of the court as to his competency in this regard, would be correct, and the court should have directed a verdict for the proponents. This rule is settled, not only by the authorities in Michigan, but is recognized by courts generally." (*Rivard v. Rivard*, 109 Mich. 98, 115, 66 N. W. 681.)

Senile dementia may deprive the patient of control of sexual desire, while not infrequently the desire itself is increased. The result is, breaches of decorum and sometimes attempts at crime, especially upon children. Frequently the dotard desires to marry a young woman. Should such a marriage be contracted, it is usually accompanied or followed by a will which, of course, is in due time contested. The following is a typical instance:

"This is a will contest. The testator, John Hamon, was a bachelor until he was eighty-three years old, then he married a woman of twenty-five years. He was married August 2, 1899. The will was made August 17th, and he died in November of that year. His estate was estimated at $18,000 or $20,000. It consisted chiefly of a farm of 293 acres in Platte county. By his will he gave all his property (except nominal bequests) to his wife, and named her brother to be the sole executor without bond. His heirs were a brother and sister and the children and grandchildren of deceased brothers and sisters. They are the plaintiffs in this suit; the defendants are the widow and the executor. . . . If . . . it should be conceded that the plaintiffs' testimony went all the way to prove that the testator was afflicted with senile dementia on the subject of women, it stopped short of the point of tending to show that he did not possess mental capacity to make a will. A man may be demented on one subject, he may be old and feeble in mind and body, childish, yet if he has mind and memory enough to know what property he has, to know how he wants to will it, who the objects of his bounty are, and the disposition

he is making of his estate, he possesses all the capacity the law requires to enable him to make a will. The evidence for the defendants showed that the testator possessed this capacity in a degree at least equal to that that could be expected in a man of his age, and the testimony for the plaintiffs tended only to prove that he showed a symptom of mania for women, he was forgetful of some trivial matters and exhibited those signs of decay that nature usually holds out in the person of everyone who lingers beyond his allotted three score years and ten." (*Hamon v. Hamon,* 180 Mo. 685, 690, 701, 79 S. W. 422.)

The supreme court of Iowa has undertaken to limit the meaning of the term "senile dementia" when used in legal proceedings.

"Before we discuss the evidence upon which the contestants rely, it will be well to note what senile dementia really is. That it differs greatly both in process and progress of decay is freely admitted by all writers on the subject. Medical observers say that it can not be described by any positive characters; that, in its gradual advance to incompetency, it embraces a wide range of infirmity, varying from simple lapse of memory to complete inability to recognize persons or things; 'that often the mental infirmity of the aged is by no means as serious as might be supposed at first sight, and that, to use a figure of speech, the mind may be superficially rotted while it is sound at the core.' It is generally said that one of the surest symptoms of mental decay is the loss of memory; and especially in respect of names and dates; but it is fully recognized in the authorities that, while an old person may appear oblivious in such matters, his mental grasp of the relations he sustains to others and more especially to the immediate members of his family, and to others who would be the natural objects of his bounty, and of his own interest and affairs, his capacity and solid understanding may still remain firm. Failure of memory is not alone enough to create testamentary incapacity, unless it extends so far as to be inconsistent with the 'sound and disposing mind and memory' requisite for all wills. 'Great age alone does not constitute testamentary disqualification,' and 'there is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled con-

dition of mind or body.' *Horn v. Pullman,* 72 N. Y. 269. The law wisely sustains wills made by persons of impaired mental and bodily powers, provided it appears that the will is the uninfluenced act of the testator, and he has the requisite intelligence to comprehend the condition and extent of his property and remember the persons who would ordinarily be his beneficiaries. In *Banks v. Goodfellow,* L. R. 5 Q. B. 549, Chief Justice Cockburn held that, though mental power be reduced in old persons below the ordinary standard, yet, if the testamentary act is understood and appreciated in its different bearings, if the mental faculties retain enough strength to comprehend the transaction entered upon, the power to make a will remains. In other words, to constitute senile dementia, there must be such a failure of the mind as to deprive the testator of intelligent action. Such is the rule of our own cases, and the rule established by the great weight of authority." (*Gates v. Cole,* 137 Iowa, 613, 115 N. W. 236.)

The books are full of cases sustaining wills made by testators who exhibited symptoms of senile dementia in advanced stages, although the pathological term was not used in the decisions. Cases upon the subject of "what is testamentary capacity" are collated at great length and well classified in a note found in 27 L. R. A., n. s., at page 1, continued in L. R. A. 1915 A, at page 443.

The result is the finding relating to the testator's knowledge and comprehension of his property and business affairs is unaffected by the accompanying finding of disease-shattered mentality and mental incapability.

Close scrutiny of the findings discloses that the most important symptoms of senile dementia exhibited by the testator were not so striking as they have been stated.

That the testator's conduct at the time of his wife's death was not due to any permanent cessation of mental power is conclusively established by the following finding of fact:

"*Ten two-thirds:* From the time of the death of his wife, when he came to realize that she had passed away,

to the time of his own death, Dr. Henry Wisner at all times manifested deep sorrow over the loss of his wife."

The court found that the testator took an unnatural dislike to the family of his son Charles, believing that they had not treated his wife with proper respect and had been cruel and unkind to her, but that neither Charles nor his family had given a real or substantial reason for this dislike, that it existed in the testator's imagination alone, and arose from his failing mentality.

At the time the will was executed the family of Charles was not a very definite group of persons toward whom dislike could be evinced and individuals are not specified. He had a wife and six children, two of whom were married and had children of their own— great-grandchildren of the testator. Perhaps if this court had been making the findings it might have given considerable weight to the testimony of the mother of Charles's children as to the attitude of the testator toward them. She knew if any one knew, and she doubtless spoke from the depths of a mother's heart when she testified as follows:

"There was a time when the Long children came pretty frequently to see the Doctor. They called him grandpa and got into his lap and played with him. They seemed to be very fond of him. He always treated my children very coldly. He did not allow them to climb over him and get into his lap as he did the Long children."

This court, however, is dealing with the case on the basis of the findings of fact, and the few other incontestible matters which it may take into consideration within the rule announced in *Lynds v. Van Valkenburgh,* 77 Kan. 24, 33, 93 Pac. 615, written instruments and other written documents, admissions of parties, pleadings, depositions, and findings of fact.

The court found that Charles and Henry, in obedience to their mother's request, prevented the testator from entering the house when he called to see the remains

of their mother before her burial. When testifying as a witness in his own behalf, Charles made the following statements:

"Henry did not threaten to kill him but told him not to come in. After that father sent me and Albert to school at Notre Dame, Indiana. I went there in November '74 and stayed there part of the next spring term when I came back to Chicago. I simply did not want to go to school there. I stopped in the middle of the term. I just simply told them that I wanted to come back to Chicago. I went into the teaming business. At that time I took an occasional drink, just like most everybody in Chicago. At that time I was not a drinking man but a little later I was. At that time Henry J. was working around the city. We got along like lawyers, fight one minute and friends the next; would drink one minute and sober up the next. Henry became an inmate of an (inebriate) asylum in Chicago. He was there twice. The second time he was about fifty. The institution was the Washington Home. I do not know that we abused our step-mother any more than children naturally would. I do not know that I ever spoke about my step-mother as being a woman of bad character. I remember of Henry's threatening to cut my guts out. This was after my step-mother's death and after the will was made."

In a written document which the testator dictated and signed at the time his will was executed he said:

"Intemperance, old whiskey, has destroyed my family and made drunkards of my boys."

The court found that Charles and his stepmother sometimes quarreled, and while their relations were not severed and remained cordial and ordinarily affectionate, he sometimes used to her and of her language profane, unkind, and in a few instances, cruel. This finding was supported by evidence of coarse and vulgar epithets applied to Mrs. Wisner and of a brutal defamation which Charles circulated, which wounded his father most deeply. Charles denied the defamation, but lack of proper respect for Mrs. Wisner extending to cruelty on the part of Charles was expressly found

4—95 KAN.

by the court. It was not a figment of the testator's imagination. It was not a delusion springing from a mind disordered by disease. It had a solid basis in reality. However much it may be regretted that the testator could not forgive, as Mrs. Wisner probably did, his resentment was human and natural, and if he magnified his injury and illogically and unjustly carried his resulting prejudice too far, so that it extended to the family over which Charles presided, he was not possessed of an insane delusion within the purview of any well-considered decision of which this court is aware. The following cases taken from the multitude bearing upon the subject are illustrative: *Medill v. Snyder*, 61 Kan. 15, 58 Pac. 962; *Harbison v. Beets*, 84 Kan. 11, 113 Pac. 423; *Riddle v. Gibson*, 29 App. Cas. D. C. 237; *In re Spencer*, 96 Cal. 448, 31 Pac. 453; *Snell v. Weldon*, 243 Ill. 496, 90 N. E. 1061; *Purdy's Admr. v. Evans*, 156 Ky. 342, 160 S. W. 1071; *Bean v. Bean*, 144 Mich. 599, 108 N. W. 369; *Stackhouse v. Horton*, 16 N. J. Eq. 202.

Besides what has been said, during the time that Charles and Henry were disappointing their father's hope, another man and his family were by immutable laws of nature taking their place, in part at least, in his affections. In the document executed in connection with his will Doctor Wisner said:

"No man could have been a more faithful son to a man than Mr. Long has been to me, legal adviser and as a friend. There is no one who could have been a dearer friend to my wife than Mrs. Long, not even a sister. Those children have come nearer to me than any other children that existed. Of course, they are not my children but they are nearer to me by association."

The syllabus of the case of *Bean v. Bean*, supra, reads as follows:

"The opinion of a father that certain of his children, whom he disinherited, had wronged and cheated him, and were scheming to get possession of his property,

cannot be said to be the result of insane delusions, so as to invalidate his will, where there were real controversies between them which may have given rise to his belief, irrespective of which of the parties might have been able to make the better showing of real right.

"The opinion of a father that a son has no regard for him, and is waiting for him to die in order to get a portion of his estate, cannot be said to have no foundation in fact and to be the result of an insane delusion, except, it may be, in cases where relations, induced by a lifetime of dutiful conduct on the one side and of continued and known affection on the other, are suddenly and without known cause interrupted and succeeded by an attitude on the part of the father utterly inconsistent with past conduct." (Syl. ¶¶ 1, 2.)

Doctor Wisner had been a ranchman during the portion of his life spent in Kansas. After he moved to Sharon he responded, not lavishly but adequately, to a few civic needs of the community, to which gifts his name was attached, and he gave the sum of $1000 to the Masonic lodge, of which he was a member. The findings show that he did possess property interests elsewhere than in Kansas. Undue influence affecting the will was expressly negatived.

The time when a contested will was made is always the time of primary importance in estimating the mental capacity of the testator. Evidence of capacity or want of capacity before or afterwards merely aids the investigation of the subject of testamentary capacity at the time the will was executed. In the case of *Kerr v. Lunsford,* 31 W. Va. 659, 8 S. E. 493, which involved the contest of a will on the ground that the testator was afflicted with senile dementia, the court said:

"It must always be remembered that the time to be looked to for the testator's capacity is the time when the will was executed. The evidence might be so clear, to the minds of the jury, that at that time the testator was competent, as to leave no doubt whatever in their minds, even though they might believe from the evidence that previous to the execution of the will the

testator was afflicted with a disease which materially affected his mind and memory, and which progressed in its effects upon his mind to the date of the will, and for sixteen months afterwards, when, because of said disease, the testator was mentally incapacitated to transact business." (p. 683.)

In the case of *Delaney v. City of Salina*, 34 Kan. 532, 9 Pac. 271, an instruction to the jury in the following terms was approved:

" 'You will notice the points of time to which your attention is directed, and you are called upon to answer as to unsoundness of mind at the time of the execution of the will, and by "execution of the will" is meant the time of his (the testator's) forming his judgments and intents as to what to do with his property; the times of directing and having them put upon paper, and the final settling of or determining what they should be; the signing of his name thereto; and the delivery of the instrument as and for his will and testament.' " (p. 537.)

So far as known this is settled law everywhere.

The production of the will in question occupied portions of three consecutive days.

The findings state that, by previous appointment the testator went from Sharon, in Barber county, to Wichita, in Sedgwick county, to have his will drawn. He was accompanied by his son Henry. He arrived at Wichita in the evening, was met at the train, and stayed at the hotel where Chester I. Long resided with his family. The next morning he was conducted to Mr. Long's office in the Beacon building, and there had a private interview with Mr. Long on the subject of the will. When Mr. Long learned that a legacy of $25,000 was to be given to members of his family he announced that he could not draw the will. He excused himself and went to see C. Q. Chandler, president of a Wichita bank and a close personal friend of both Mr. Long and Doctor Wisner. At Mr. Long's request Mr. Chandler went to Mr. Long's office, had a few minutes' private talk with Doctor Wisner, and then informed Mr. Long

that Doctor Wisner was fixed in his determination to make the bequest referred to.  Mr. Long again announced that he could not draw the will, and recommended for the purpose Mr. A. E. Helm, a practicing attorney whose offices adjoined those of Mr. Long.  Mr. Helm was sent for and introduced to Doctor Wisner and the two then returned to Mr. Helm's office.  A memorandum of the proposed disposition of the testator's property was made.  Late that evening Mr. Helm dictated a draft of the will to a stenographer.  Subsequently the draft of the will was read over to Doctor Wisner, who directed that several changes be made in order that the will might conform to his wishes.  The will was then redrafted and later was duly executed. At the suggestion of Mr. Helm, Doctor Wisner dictated to the stenographer a statement as to why he desired to make the will as he did, and after the dictation had been typewritten, signed the statement.  Mr. Helm incorporated in the will those provisions only which he was directed by the testator to incorporate in it, and all the provisions of the will were suggested to Mr. Helm by the testator unaided by any one present and no one else was present at the time.  No influence to make any gift or bequest was exerted by the Woman's Christian Temperance Union, one of the beneficiaries of the will, or by any of its officers.

The foregoing recital of the findings returned by the court gives but the merest outline of what occurred. The testimony of Mr. Helm shows that some three hours were consumed in completing the memorandum for the first draft of the will.  On the suggestion by the testator that a part of his estate was to be devoted to the temperance cause and for humane purposes, Mrs. Frankenfield and Mrs. French, members of the Woman's Christian Temperance Union, were called to Mr. Helm's office, discussed with the testator the purposes of their organization, and received from him statements as to why he was considering their organization as a beneficiary of his will.  Mary E. Dobbs,

corresponding secretary of the state Woman's Christian Temperance Union, who was specially acquainted with the organization and work of that society, called at about three or four o'clock in the afternoon and had a conversation with Doctor Wisner upon the subjects indicated. The will was dictated to a stenographer that evening. The next day the stenographer transcribed his notes, the draft of the will was read to Doctor Wisner, was corrected by him in important particulars, and was rewritten and executed as has been stated. After the statement which has been referred to had been dictated and executed, Mr. Helm, without suggestion from any one, asked permission to call a physician to talk with the testator, because the subject might afterwards become important. The testator consented, Doctor Oldham was called, and had a private interview of considerable length with the testator. Mr. Helm's testimony is closely followed in the findings as far as they go, and this court regrets that it is deprived of the benefit of more detailed findings covering the very time most significant and material of all. Perhaps the trial court deemed it unnecessary to extend the findings because of its theory of senile dementia.

It is clear that the appointment to go to Wichita to have his will drawn did not fade from the testator's memory, and that he persisted in making a will until he accomplished his purpose. The subject was not a new one to him. As a matter of business prudence he had not been without a will since 1886. Whenever an emergency demanding it occurred he changed his will, and the subject of leaving a will at his decease may well be referred to the powerful business faculties which the court found were the last to be affected by his disease. The will, found in the pleadings, and the statement accompanying it, found in the findings, both products of the testator's unaided memory, comprehension, and judgment, follow:

"I, Henry Wisner, of Barber County, Kansas, being

of sound and disposing mind, do hereby make, publish and declare this my last will and testament, hereby revoking all former wills by me at any time made.

"*Item I.*—I nominate and hereby appoint C. Q. Chandler of Wichita, Kansas, and T. L. Lindley of Medicine Lodge, Kansas, as executors and trustees of my said will.

"*Item II.*—Whereas I have heretofore by deeds, executed and delivered, given to my sons Charles H. Wisner and Henry J. Wisner, my home place in Barber County, Kansas, consisting of eight hundred acres (800 acres) of land with improvements thereon, and whereas in such deeds of conveyance there were placed therein by me certain restrictions upon the free alienation of said property by my said sons, and whereas I desire that after my death that my said sons shall hold the said property in fee simple and without conditions, I hereby give, devise and bequeath to my said sons, Charles H. Wisner and Henry J. Wisner, all of the lands belonging to said home place as the same are described in said deeds of conveyance, to them and their heirs absolutely and forever without restrictions or conditions of any kind whatsoever.

"*Item III.*—I give and bequeath to my esteemed friend, Hon. Chester I. Long, the gold watch, chain and charm which I have carried for many years.

"*Item IV.*—I hereby give, devise and bequeath all the rest, residue and remainder of my estate, real personal or mixed, wheresoever situated, whereof I may be seized or possessed or to which I may in any manner be entitled or in which I may be interested at the time of my death, unto my said executors and trustees hereinbefore named and to their heirs and assigns forever in trust nevertheless, as follows:

"It is my will that as soon as practicable after my death my said executors and trustees shall without sacrifice sell, collect and convert into money or notes secured by mortgages on real estate all my property of whatever kind or character which shall come into their possession as such executors and trustees and dispose of the same as hereinafter provided.

"*Item V.*—I direct that all my just debts and funeral expenses be paid.

"*Item VI.*—Whereas I have heretofore given to my son, Charles H. Wisner, in addition to the interest in

said home place heretofore deeded to him, property of the value of four thousand dollars ($4,000), and whereas it is my desire that my two sons, Charles H. Wisner and Henry J. Wisner, shall receive equal amounts out of my property and estate, it is my will that my executors and trustees shall pay to my son, Henry J. Wisner, within one year after my death, the sum of four thousand dollars ($4,000) in money. It is my will that the above and foregoing provisions shall constitute the entire interest which my said sons shall receive out of my property and estate.

"*Item VII.*—I direct that my said executors and trustees shall pay out of the first money coming into their hands as said executors and trustees to Mrs. Sabra A. Nicely, Mrs. Olive Barrett and Mrs. Dulcina Cole, of Tioga, Pennsylvania, the widowed sisters of my deceased wife, the sum of three thousand dollars ($3,000.) to be held and used by the said Sabra A. Nicely, Olive Barrett and Dulcina Cole jointly for their use and benefit during their lifetimes, and upon the death of any of them, the remainder, if any, of such funds to go to the survivor or survivors, and if there be any remainder of said funds unused at the time of the death of the last survivor of said sisters, it is my will that the said remainder be paid to my deceased wife's sister, Cloe Peck, and her daughter Nellie Krite, of the State of Illinois, to be held by them absolutely, share and share alike.

"*Item VIII.*—I have heretofore made provision for my late wife's sister, Mrs. Cloe Peck of Dupage County, Illinois, by deeding to her lands in the State of Illinois for which reason I have made no other or further bequest to her in this will than as hereinbefore provided.

"*Item IX.*—It is my will that my said executors and trustees shall within five years (5 yrs.) after my death turn over to Mrs. Anna B. Long, the wife of the Hon. Chester I. Long, the sum of twenty-five thousand dollars ($25,000) in money or securities to be held by her in trust for the use and benefit of Agnes Long and Margaret Long, the daughters of my friends, Hon. Chester I. Long and his wife, Anna B. Long, and Vera Clemes, who is a relative and a member of the family of said Chester I. Long and wife, said sum to be invested, reinvested, and kept invested by the said Anna B. Long and the income thereof, less taxes and other legal expenses, to be by her paid to the said Agnes Long,

Margaret Long and Vera Clemes, one-third (⅓) each until such time as the said Margaret Long shall have attained the age of twenty-five (25) years, or in case of her death, until such time as she would, if living, have attained the age of twenty-five (25) years, at which time the principal of said sum shall be paid over and given absolutely to said Agnes Long, Margaret Long, and Vera Clemes, or the survivor or survivors of them, share and share alike, to be held by them forever: provided that the said Anna B. Long shall have the power to name and appoint by will or otherwise her successor as such trustee in case of her death before said trust is fully executed, and it is further my will that the said Anna B. Long or her successor, appointed as provided herein, may in her discretion pay over to said Agnes Long, Margaret Long, and Vera Clemes, or to either of them, at such times and in such amounts as she may deem proper and to their best interest, at any time prior to the expiration of the time hereinbefore designated for the payment of said sum to said legatees, but any amount so advanced to any such legatees shall be deducted from the amount to be received by them at the final distribution of said fund, so that each of said legatees shall receive equal parts of said sum.

"*Item X.*—I have, at the time of making this will, arranged to erect in the city of Medicine Lodge, Kansas, a public memorial drinking fountain for public use in said city. It is my will that in case I shall not have completed the erection of said fountain before my death that my executors and trustees shall complete the erection of said drinking fountain in accordance with the plans and agreements which have been made between myself and the mayor and council of the said city of Medicine Lodge and to pay for the same out of the funds coming into their hands from my estate.

"*Item XI.*—It is my will that after paying and providing for all the above and foregoing provisions and bequests that my executors and trustees shall within five (5) years after my death pay over in money or securities all the rest, residue, and remainder of my estate, to the Women's Christian-Temperance Union of the State of Kansas, a corporation duly organized and existing under the laws of the State of Kansas, to be

used by said organization as the officers of said organization may direct for the purpose for which said organization was incorporated as shown by its charter.

"IN WITNESS WHEREOF I have hereunto set my hand and seal this 19th day of October, A. D. 1911."

"STATEMENT MADE TO A. E. HELM BY DR. HENRY WISNER ON OCTOBER 19, 1911, GIVING HIS REASONS FOR CERTAIN BEQUESTS MADE IN HIS WILL OF THIS DATE.

"MR. HELM: In view of the peculiar disposition that you are making of your property I would like to have you give me in your own words the reason that prompted you to make these children your beneficiaries.

"DR. WISNER: To begin with Mr. Long came to our town a young man and it so happened that he soon became my attorney, and as my attorney he has been one of the most faithful ones I have ever had. When he ran for Congress—while he was in Congress a case in the Supreme Court came on and the attorney on the other side got the case dismissed, and when I saw Long I asked him if it was any different to his client whether his attorney got drunk on whiskey or on politics and his client got kicked out of court. He said, 'I do not know, but the result is just the same.' He met the Judge and told him what I had said and said, 'I have succeeded in the election and I have come to see if I can succeed in getting the case restored.' He did succeed. When he got married, he brought his wife to Medicine Lodge; he was well acquainted with my family and it was one family to whom he could introduce his wife. Usually a bachelor has many friends but knows few families. She became acquainted with us and she and Mrs. Wisner became firm and fast friends at once, and Mrs. Long has repeatedly said to me that Mrs. Wisner was more to her like a mother than any other person who had ever lived. And the children— Mr. Long was away much of the time and my home was their home. They were there as little bits of tots. They were there a great deal of the time and became more to us than any other children in existence and that is why I—No man could have been a more faithful son to a man than Mr. Long has been to me, legal adviser and as a friend. There is no one who could have been a dearer friend to my wife than Mrs. Long, not even a sister.

Those children have come nearer to me than any other children that existed.   Of course, they are not my children but they are nearer to me by association.

"Mr. Helm : Now I wish you would in the same way give me your reasons why you have selected the W. C. T. U. as the beneficiary of the balance of your estate.

"Dr. Wisner: Carrie Nation was the victim of intemperance and I feel that I have been a victim, too, that intemperance perhaps destroyed the happiness of her domestic life.   Intemperance, old whiskey, has destroyed my family and made drunkards of my boys. Those are the facts and that is one reason that I would go to that institution, and another reason that I go to that institution in preference to others is that I think there is less graft, less corruption in it.   In all business I have never known a defaulter who wore petticoats, and I have been pretty familiar with defaulters since the defalcation of Swarthout in Western New York.   It was so unusual at that time that whenever one defaulted he was said to have 'Swarthouted.'   In all business transactions you call to mind it is rare that ever a woman has defaulted.   For that reason I have more confidence in an institution managed by women than in an institution managed by men.   I have a great deal more confidence in their moral and financial honesty.   And I think that they will reach the suffering and destitute better than any other society.

"Mr. Helm : You might, if you care to, say why you feel you have this surplus.   You have told me that you have given to your sons all that they need and can use to advantage and that you have not done it to cut off your children.

"Dr. Wisner : I feel that I have provided for them all that they need, and now I am providing for the needs of those who cannot help themselves.

"I have read the foregoing statement and find the same to be true and correct as dictated by me.

Henry Wisner.

"The above statement was taken down in shorthand by A. M. Cowan in the presence of A. E. Helm and Dr. Henry Wisner and was by him transcribed and read to Dr. Henry Wisner, who signed the same in our presence.

A. E. Helm,<br>A. M. Cowan."

The court does not propose to debate the rationality of these instruments. They show full comprehension of the business in hand and of its various elements. There is full and accurate memory of names, relationships, and places of residence. There is full and accurate memory of events and transactions, recent and more remote. There is no deficiency of ideation or feebleness of judgment. The reason is active, the will is firm, and the prudence and forethought and insight displayed are quite remarkable. There is no trace of emotional instability and no trace of the vaingloriousness alluded to in the findings of fact. Concepts of a high ethical character are predominant. In the dictated document there is sustained attention, the speech is dignified and coherent, and the flow of thought logically coordinated. The characteristics of senile dementia are conspicuously absent. Being the products of an unprompted and uninfluenced mind, as the court expressly found these instruments to be, they evince testamentary capacity.

"The law does not require that a testator shall have absolute soundness of mind in all particulars, but only soundness of mind with regard to the particular matters under consideration; nor does the law require that he shall have the greatest or most perfect capacity of mind, but only such an amount and kind of capacity as will enable him to know what he is doing, the ties of relationship, his obligations to kindred and friends, and to whom he is giving his property." (*Delaney v. City of Salina,* 34 Kan. 532, syl. ¶ 3, 9 Pac. 271.)

It is a rule of law because it is a rule of common experience that a creation of the mind may be of such a character and may occur under such circumstances that it proves the sanity of the creative act. In the case of *Cartwright v. Cartwright,* 1 Eccl. Rep. 47, decided in 1793, the court reasoned upon the subject as follows:

"Now I think the strongest and best proof that can arise as to a lucid interval is that which arises from the act itself; that I look upon as the thing to be first

examined, and if it can be proved and established that it is a rational act rationally done the whole case is proved. What can you do more to establish the act? because, suppose you are able to show the party did that which appears to be a rational act, and it is his own act entirely, nothing is left to presumption in order to prove a lucid interval. Here is a rational act rationally done. In my apprehension, where you are able completely to establish that, the law does not require you to go further, and the citation from Swinburne does state it to be so. The manner he has laid it down is, (it is in the (b) part in which he treats of what persons may make a will) says he, the last observation is, 'if a lunatic person, or one that is beside himself at some times but not continually, make his testament, and it is not known whether the same were made while he was of sound mind and memory or no, then, in case the testament be so conceived as thereby no argument of phrensy or folly can be gathered, it is to be presumed that the same was made during the time of his calm and clear intermissions, and so the testament shall be adjudged good, yea although it cannot be proved that the testator useth to have any clear and quiet intermissions at all, yet nevertheless I suppose that if the testament be wisely and orderly framed the same ought to be accepted for a lawful testament.' Unquestionably there must be a complete and absolute proof the party who had so formed it did it without any assistance. If the fact be so that he has done as rational an act as can be without any assistance from another person, what there is more to be proved I don't know, unless the gentleman could prove by any authority or law what the length of the lucid interval is to be, whether an hour, a day, or a month; I know no such law as that." (p. 51.)

In the case of *Kinleside v. Harrison,* 2 Phillimore's Eccl. Rep. 449, decided in 1818, the alleged incapacity of the testator was stated as follows:

"About 1812 the mental faculties, and especially the memory of Mr. Andrews Harrison, had become weakened from his great age, and the general decay of nature, and, about the middle of that year, were so much impaired as to render him incapable of comprehending the state of his affairs, or of recollecting those

about him, or of understanding what passed in conversation;—that the deceased was, from that time to the time of his death, childish and incapable of the management of his affairs, and was so considered and treated by the said Sarah Jukes, and the other persons about him; and in consequence thereof, the servants and all others, from that time down to the time of his death, used to apply to Mr. Kinleside or Mrs. Jukes for orders. The deceased had lost the knowledge and recollection of his friends and acquaintance, and when any person called, it was necessary to explain who they were, otherwise he could not recognize his most intimate friends;—that he frequently got up in the middle of the night and lighted his candle, and would suffer it to burn out in the socket;—that he would frequently make water in the fire in the presence of Mrs. Jukes, being utterly unconscious of the impropriety of so doing;—that he was unimpressed by the death of his brother, which took place in November, 1813; that he took very little notice of it, and was in no degree moved or affected thereby; and then it goes on to state other circumstances, shewing entire incapacity in the deceased." (p. 454.)

A Mr. Boodle had prepared the contested instrument, and had expressed an opinion that the testator was of sound mind. An attesting witness expressed a contrary opinion and said that from the middle of the year 1812 the deceased had a latent defect of memory which rendered him incapable of any testamentary act. The court said:

"The Court would rather have expected to have heard some precedent or authority for such a position: that because the memory of a person may in some respects be defective, therefore it is not a testamentary memory. We very well know that memory is excessively different in different persons—nothing is more various—its powers are very different in the same person at different times, and more particularly at different periods of life; in old age it is much less retentive, and more liable to confusion. Lord Coke says, a man ought to have a 'disposing memory,' so as to have an ability to make a disposition with understanding and reason: so says Swinburne—'if a man in his old age becomes a very child again, and is so forgetful that he has

forgotten his own name, he can not make a will; but the infirmities of old age, which do not take away the use of reason, do not hinder them in that condition from making a will.' . . . Mr. Boodle, it is true, certainly does not upon this occasion go through the whole items of all the will and codicils as a preliminary, in order to ascertain whether or not some latent defect of memory and confusion might not be discoverable, but he brings to the recollection of the deceased everything connected with the particular disposition he has made, and the memory is so far found to be perfect. Mr. Boodle is quite satisfied as to the capacity upon that occasion. The Court has something better—the Court has the instrument itself before it, dictated by the directions of the deceased himself, for Mr. Boodle says he received no assistance whatever—it was his own instructions from his own mouth." (pp. 534, 535.)

In the case of *George Weir's Will*, 39 Ky. 434, the court said:

"The best possible proof of a sound and disposing mind is '*a rational act, rationally done*,' which reason alone could have conceived and accomplished. There is no use for metaphysics then; nor should speculation perplex the judgment, when the question is solved by the palpable fact that rational intellect shows itself by acts which can be the offspring of no other than an intelligent, sound, and reasoning mind." (p. 441.)

In the case of *Spratt v. Spratt*, 76 Mich. 384, 43 N. W. 627, the syllabus reads:

"When, in the absence of fraud or undue influence, it is shown that a testator either wrote or dictated the will produced, the *fact* is established that he was capable, mentally and physically, of doing whatever the instrument shows was done; and the only question is, does the instrument on its face indicate that it is the emanation of an unsound mind, when applied to the facts and circumstances upon which and under which it was intended to operate, namely, the estate disposed of, and the manner of disposition?" (Syl. ¶ 1.)

In the case of *Martin v. Bowdern*, 158 Mo. 379, 59 S. W. 227, the opinion reads:

"The testimony amply shows that the testator was of legal age, sane and fully competent to make a will.

He knew what act he was performing, what property he possessed, the disposition he was making of it and the persons and objects of his bounty, for he dictated the terms of the will himself, and the face of the will shows these facts. This is all the law requires." (p. 390.)

Unless, therefore, the findings contain something specific which clearly forbids the conclusion, otherwise quite irresistible, that the testator was of sound mind, the will must stand. The mere fact of a lesion producing indicia of senile dementia is not enough. The suggestion of an insane delusion has been disposed of. What else do the findings suggest?

In the eighteenth finding it is concluded the testator did not possess an intelligent understanding of the disposition he desired to make of his property or of the persons he desired should receive it, and did not possess the capacity to recollect and comprehend the nature of the claims of those who were excluded from participating in his bounty. The ninth finding of fact reads as follows:

"At the time of Mrs. Wisner's death, her next of kin consisted of four sisters, three of them widows and more or less dependent, one of them being an invalid, living in Penn. and the fourth, Mrs. Peck, living at La Grange, Illinois, and one niece, a daughter of Mrs. Peck, living in Chicago. Mrs. Peck's husband was over 80 years of age and had lost his property, and Mrs. Peck was providing for herself and husband by teaching music, and there was a $1500 mortgage on her little home in La Grange. Mrs. Wisner and the testator had visited these relatives of hers, in Chicago, a few weeks before her death, and she was much shocked to learn of the financial condition of the Pecks, and she promised that as soon as she could get home and make the necessary arrangements, she would take up the $1500 mortgage, and relieve Mrs. Peck of the necessity of teaching for a living. Mrs. Wisner and the testator also informed Mrs. Peck, at that time, that eventually their property should go equally to her relatives and his."

It will be observed that the testator was in Chicago visiting his wife's relatives only a few weeks before her death. The will was made only twelve days after her death, and on the court's hypothesis he was the hopeless victim of senile dementia. At the time of the visit to Chicago the property stood in Mrs. Wisner's name and Doctor Wisner had made his will to her. She was many years his junior, there was no reason to suppose that he would outlive her and would be called upon to make a distribution of his property himself, and the statement as to how the property should ultimately go was seemingly the statement of what Mrs. Wisner would eventually do. But granting, as we readily do, that Doctor Wisner understandingly joined in the information given Mrs. Peck, when he was suddenly called upon, very soon afterwards, to dispose of his property himself, he remembered perfectly every one of his wife's relatives, their residences and their relationship. He recognized clearly their claims upon his bounty. He provided for the widowed sisters. He remembered Mrs. Peck's present needs, deeded her property instead of providing for her in his will, and so stated in the will. Even Nellie Krite was not forgotten. He comprehended the entire situation, reasoned upon it, and then acted upon his own judgment and according to his own desire. (Items VII and VIII of the will.) The old common-law expression "sane and perfect memory" applies literally.

The testator's own relatives were "one brother in Chicago who was wealthy and one sister in New York state who was and has long been dependent upon the charity of the Chicago brother." There is nothing to indicate what the disposition of the testator towards this brother and sister, or of them toward him, was, and it would be idle to attempt to manufacture out of the simple blood-tie a "duty" to provide for this wealthy brother and the sister who looked to him.

5—95 KAN.

The testator had two sons, Charles and Henry. When the will was made he remembered perfectly just what had been done for them in March, 1910, and January, 1911, and exactly comprehended what the restrictions placed in the deeds to them meant. During the years when the testator's mind retained its full vigor, long after the characters of his two sons had been formed and their capacities had been demonstrated, long after Charles was established on his eighty-acre tract and his family had grown up, and as late as the year 1908, the testator had made a will giving these sons $100 apiece. In his last will he gave them unconditional title to 800 acres of land which had been his own home place, placed Henry on equal footing with Charles, and then declared that those provisions should constitute the entire interest which his sons should receive out of his property and estate. (Items I and VI of the will.) There was no failure of comprehension, either of persons or claims, in these bequests.

The children and grandchildren of Charles are the only remaining relatives to be considered. It may be remarked here that nobody is ever "excluded from participating in the testator's bounty" by a will unless some bounty already enjoyed is taken away by the terms of the will. The right to make a will is given in order that the devolution of property under the statute of descents and distributions may be cut off according to the testator's own will. The law does not require that a will shall be natural or reasonable or sensible or kind. The popular notion of the testamentary right does not accord with the legal notion. It is the duty of the courts and of the legal profession to follow the law. Now what capacity did Doctor Wisner display in making his will? He recognized the claims of blood, and provided for his sons. He recognized the claims of those who were of his wife's blood, and provided for them. He recognized the ties of friendship and the ties of affection, and provided for Mr. Long and his

children.   He recognized the obligation to the little city in which he lived, to complete the improvement he had commenced.   He recognized the claim of charity, and gave out of his abundance to an organization engaged in mitigating the evils which flow from the traffic in intoxicating liquors.   The burden of proof rests heavily upon that court which undertakes to dispute the sanity of such a gift by a man who has had two drunken sons.   Such being the testator's capacity to understand the claims upon him, the disposition he desired to make of his property, and the persons who were to receive it, the omission to mention the children and grandchildren of a son whom he did provide for does not even suggest unsoundness of mind.

There is a finding that the amount which had already been given to Charles was overstated in the will.   (Item VI.)   The fact in inconsequential.   The capacity to remember that the gift had been made, to comprehend its relation to the business in hand, to reason upon it, reach a conclusion, and shape the will accordingly, constituted testamentary capacity.

The subjects just discussed have been considered over and over again by the courts.   Whoever needs may find authorities in the classified lists of cases contained in 27 L. R. A., n. s., 1, and in L. R. A. 1915 A 443, already cited.

A portion of the eleventh finding of fact reads as follows:

"*Eleventh:* After Mrs. Wisner's funeral, and at the Wisner home at Sharon, the testator Dr. Henry Wisner, said to Mr. Long, who was in attendance at the funeral, that he wished to make a will, or change his will, so that his family would receive his property, and in compliance with that request or suggestion, and on that day, a will, denominated a codicil, was prepared by Mr. Long and executed by Dr. Henry Wisner, revoking his will made in 1908, in favor of his wife.   The revocation of this will left the testator, Dr. Henry Wisner, entirely without a will of any kind, and had he died in

the next few days, his property would have descended, according to the law of descent and distribution of this state."

It will be observed that this finding does not stop with declaring that a will was executed. Neither does it take the form of stating what the result would have been if the will were valid. The very simple document spoke plainly for itself. But the court takes pains to call the act a revocation of an existing will and to state fully positive consequences which actually followed. This being true, the testator was competent to make a will on October 9. The court did not profess to find a rapid failure of mental power between October 9 and October 19, and if the testator had the capacity to make the statement and to make the will of Ocober 9, the probabilities are greatly increased that he had capacity to make the statement and make the will of October 19. Doubtless what the testator had in mind on October 9 was whether or not, if he should die, his property would go to his wife's family under his will to her, to the exclusion of his family—a rational subject which the state of his affairs suggested to his mind, and which he treated in a rational way. Whatever his thought or his expression on the day of his wife's funeral, he had held the fixed purpose for years of not dying intestate. He immediately made an appointment to go to Wichita to have his will drawn. He went to Wichita to accomplish that end, and testamentary capacity such as the law requires, while there, is fully established.

Nothing else contained in the findings requires special notice. There is some documentary evidence in the record tending to sustain the will, which this court leaves out of consideration. The contestors stood upon the findings of fact and the contestees need nothing more. This court is able to correct the erroneous views of the law entertained by the trial court, apply the proper legal tests of testamentary capacity, and deduce the proper conclusion of fact from the specific findings stated.

The validity of the two codicils need not be investigated. The two sons are the only parties to the suit who complain of the testator's disposition of his property. The only portion of the estate which they can receive is defined in the will proper. The first codicil does not affect those provisions of the will. The only portion of the second codicil in which they now have any interest is an abatement clause which abates, if necessary, all other gifts and devises of any consequences before theirs. The effect of the abatement clause of the second codicil is misstated in the findings of fact.

The judgment of the district court is reversed and the cause is remanded to the district court with direction to enter judgment on the findings of fact against the plaintiffs, sustaining the will and its codicils.

MARSHALL, J., not sitting.